## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE GROUNDFISH FORUM,
4241 21st Ave. W.
Seattle, WA 98119;

UNITED CATCHER BOATS,
4005 20th Ave. W.
Seattle, WA 98119;

B & N FISHERIES COMPANY,
1959 NW Dock Pl.,
Seattle, WA 98107;

KATIE ANN LLC,
2025 1st Ave.,
Seattle, WA 98121

       Plaintiffs,

v.

PENNY PRITZKER, in her official capacity as
Secretary of Commerce,
United States Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230;

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION,
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230;

NATIONAL MARINE FISHERIES SERVICE,
1315 East-West Highway
Silver Spring, MD 20910

       Defendants.

Case No:

## COMPLAINT

1.    Plaintiffs The Groundfish Forum; United Catcher Boats; B & N Fisheries

Company; and Katie Ann LLC (collectively, "Plaintiffs") challenge Amendment 113 to the

Fishery Management Plan for the Bering Sea/Aleutian Islands Groundfish Fishery ("BSAI

FMP") and its implementing regulations ("Amendment 113"), as set forth in the final rule

promulgated on November 23, 2016 by Defendants Secretary of Commerce Penny Pritzker, the

National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service

(collectively "Defendants" or "NMFS") entitled *Fisheries of the Exclusive Economic Zone off*

*Alaska; Bering Sea and Aleutian Islands Management Area; American Fisheries Act;*

*Amendment 113,* 81 Fed. Reg. 84434 (Nov. 23, 2016) ("the Final Rule").

2.      Amendment 113 and the Final Rule unlawfully modify the management of the

Bering Sea and Aleutian Islands ("BSAI") Pacific cod fishery by creating an unauthorized

"harvest set-aside" of a portion of the allowed catch of cod for vessels that deliver their catch to

certain processing facilities on land in the western Aleutian Islands.  The "harvest set-aside"

unlawfully and arbitrarily restricts at-sea processing and fishing by vessels that target Pacific cod

in the "directed" fishery.

3.      Although the Final Rule states that delivery pursuant to the set aside may be to

any shoreside processor located on land west of 170° W. longitude in the Aleutian Islands, there

are only two existing processors in that area, located in Adak and Atka, Alaska, neither of which

is currently open for processing Pacific cod.  The Atka facility has never received and processed

cod from the Aleutian Islands directed fishery, and the Adak facility has only been periodically

operational over the last decade.  Neither plant processed cod during the 2015 and 2016 fishing

years.  On information and belief, neither plant intends to process cod during the 2017 fishing

year.

4.      In issuing Amendment 113 and the Final Rule, Defendants acted without statutory authority, violated the National Standards for fishery management, and failed to articulate a rational connection between the facts found and the choices made, in violation of applicable law.

## JURISDICTION AND VENUE

5.      This action arises under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

6.      This Court has jurisdiction under the MSA, which provides that '[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the MSA.  16 U.S.C. § 1861(d).  The MSA also provides that actions taken by the Secretary of Commerce under regulations implementing a fishery management plan are subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f).  NMFS published the Final Rule on November 23, 2016 in the Federal Register, and Plaintiffs are filing this complaint within 30 days of publication of the Final Rule.

7.      This Court has jurisdiction under the APA, which provides that final agency action is subject to judicial review.  5 U.S.C. §§ 701-706.

8.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts original jurisdiction over all civil actions arising under the laws of the United States.

9.      This Court may grant relief pursuant to the MSA, 16 U.S.C. § 1861(d), and the APA, 5 U.S.C. § 706, as well as declaratory relief through the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

10.     Venue is properly vested in this judicial district under 28 U.S.C. § 1391(e) because a substantial part of the events and omissions which give rise to this action occurred in this district.

## PARTIES

11.     **The Groundfish Forum** ("GFF") is a non-profit section 501(c) trade association with its principal place of business in Seattle, Washington.  GFF represents six companies and twenty trawl catcher processors.  Catcher processors catch and process fish at sea.  GFF members have a long history of participation in the Aleutian Islands Pacific cod fishery.  GFF members fish for BSAI groundfish, including Aleutian Islands Pacific cod, and process fish at sea as part of the so-called "Amendment 80" or "A80" sector.  In addition, some GFF members receive deliveries of Aleutian Islands Pacific cod from catcher vessels for processing at sea as motherships.  Motherships receive fish from catcher vessels and process it at sea.  GFF was created in order to craft collaborative solutions to problems such as minimizing discards, avoiding unintended incidental catches, and reducing impacts on habitat; to inform government officials of the contributions made by the Amendment 80 fleet to the economies of Alaska and the Pacific Northwest; and to conserve resources while keeping the fishing industry economically viable.

12.     **United Catcher Boats** ("UCB") is a non-profit section 501(c) trade association with its principal place of business in Seattle, Washington.  UCB's sixty-nine members are the owners and operators of the majority of the trawl catcher vessels that participate in the trawl fisheries in the BSAI, Gulf of Alaska, and west coast regions.  UCB members fish for groundfish in the BSAI, including Aleutian Islands Pacific cod.  UCB members do not process fish on their vessels but deliver to motherships or shore-based processors.  UCB's goal is to ensure healthy,

vibrant, and profitable fisheries located in the North Pacific and off of the West Coast of the United States.  UCB provides crucial operating information to member vessels such as real time harvest information, including fishery openings and closure announcements, quota and bycatch management tracking and assistance, and updated fishery regulations and rule making information.  UCB also presents member concerns and positions regarding fisheries management and policy issues to agencies such as NMFS and the North Pacific Fishery Management Council ("the Council" or "NPFMC").

13.     **B & N Fisheries Company** ("B & N") is a Washington corporation with its headquarters in Seattle, Washington.  B & N owns and operates eight catcher vessels which fish for pollock and Pacific cod.  Four of B & N's vessels operate only in the Aleutian Islands Pacific cod fishery and have modifications that make them uniquely suited to fish in the Aleutian Islands.  B & N vessels deliver their catch to motherships.

14.     **Katie Ann LLC** ("KAL") is a Delaware limited liability company with its headquarters in Seattle, Washington.  KAL owns and operates the trawl catcher processor *Katie Ann*.  *Katie Ann's* decades-long participation in the Aleutian Island Pacific cod fishery predates the enactment of the American Fisheries Act and the first entry of any shore-based processor in the Aleutian Islands.  *Katie Ann* currently operates both as a catcher processor and a mothership processor of Pacific cod caught in the Aleutian Islands directed fishery.

15.     Plaintiffs consistently participated in the proceedings before the Council throughout the development of Amendment 113.  Beginning in 2008, Plaintiffs participated to the extent the public is allowed in the proceedings leading to the decisions challenged here, including submitting detailed comments on various proposals before the Council and the draft rule, and/or through testimony before the NPFMC.

16.     Plaintiffs have participated in the Bering Sea and Aleutian Islands Pacific cod fisheries for decades and are highly dependent upon them.  Plaintiffs have invested in fishery permits, vessels, and equipment uniquely suited to operate in this remote and challenging environment.  Plaintiffs' catcher vessels have an interest in competitive and alternative choices for processing their catch.  Plaintiffs' trawl catcher processors have an interest in continuing opportunities to fish and process at sea.  Plaintiffs' motherships have an interest in continuing opportunities to process at sea.  All Plaintiffs have an interest in stable and predictable conservation and management of the Aleutian Islands Pacific cod fishery.

17.     The harvesting and processing interests of Plaintiffs have been, are being, and unless the relief prayed for in this complaint is granted, will continue to be adversely and irreparably injured by Defendant's restrictions on their participation in the Aleutian Islands Pacific cod directed fishery through the unlawful promulgation of Amendment 113 and the Final Rule.  These injuries are actual and concrete and would be redressed by the relief sought here.  Plaintiffs have no adequate remedy at law, and have standing to bring this action.

18.     **Penny Pritzker** is sued in her official capacity as Secretary of Commerce ("the Secretary").  She is responsible under the MSA for overseeing the proper administration and implementation of the MSA, including final review and approval of proposed amendments to fishery management plans and the associated implementing regulations.

19.     **The National Oceanic and Atmospheric Administration** is an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary, acting through the National Oceanic and Atmospheric Administration, has delegated responsibility for review of proposed fishery management plan amendments and regulations to the National Marine Fisheries Service.

6

20.  **The National Marine Fisheries Service** reviews proposed amendments and regulations for consistency with the fishery management plan and applicable law, including the MSA's ten National Standards for fishery management. The National Marine Fisheries Services publishes proposed rules for notice and comment in the Federal Register.

## LEGAL BACKGROUND

### Magnuson-Stevens Act

21.  The MSA governs the conservation and management of fisheries in United States' territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (typically 3 miles from shore) to 200 miles offshore or to an international boundary. 16 U.S.C. §§ 1801(b)(1); 1802(11).

22.  The MSA is not a general seafood industry regulatory statute.  The MSA establishes a national program for the conservation and management of fishery resources. 16 U.S.C. § 1801.  The MSA defines "fishery" as one or more stocks of fish and "any fishing for such stocks."  U.S.C. § 1802(13).

23.  The MSA defines "fishing" as "(A) the catching, taking or harvesting of fish; (B) the attempted catching, taking or harvesting of fish; (C) any other activity which can reasonably be expected to result in the catching, taking or harvesting of fish; or (D) any operations at sea in support of, or in preparation for, any activity described in subparagraphs (A) through (C)."  16 U.S.C. § 1802(16).

24.  The MSA created eight regional fishery management councils, including the NPFMC.  The councils prepare fishery management plans for fisheries under their authority that require conservation and management.   16 U.S.C. § 1854.

25.     The MSA provides that fishery management plans, plan amendments, and any regulations promulgated to implement such plans must be consistent with the National Standards for fishery conservation and management, and certain other procedural and substantive requirements.  16 U.S.C. § 1851(a).

26.     A council is responsible for amending a fishery management plan "as necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which plan was developed)."  16 U.S.C. § 1852(h)(1).

27.     National Standard 4 provides that conservation and management measures "shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges."  16 U.S.C. § 1851(a)(4).  Regulations promulgated by NMFS state that an allocation scheme "must be designed to deter any person or other entity from acquiring an excessive share of fishing privileges, and to avoid creating conditions fostering inordinate control, by buyers or sellers, that would not otherwise exist."  50 C.F.R. § 600.325(c)(3)(iii).

28.     National Standard 5 provides that conservation and management measures "shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."  16 U.S.C. § 1851(a)(5). Regulations promulgated by NMFS state that an FMP should demonstrate that "management

measures aimed at efficiency do not simply redistribute gains and burdens without an increase in efficiency."  50 C.F.R. § 600.330(b)(2)(i)); *see also* 50 C.F.R. § 600.330(e).

29.     National Standard 8 provides that conservation and management measures "shall, consistent with the conservation requirements" of the MSA, "take into account the importance of fishery resources to fishing communities" by utilizing economic and social data that meet the best scientific information available requirement of National Standard 2 "in order to (A) provide for the sustained participation of such communities and (B) to the extent practicable, minimize adverse economic impacts on such communities."  16 U.S.C. § 1851(a)(8).  Regulations promulgated by NMFS state that this standard "does not constitute a basis for allocating resources to a specific fishing community nor for providing preferential treatment based on residence in a fishing community."  50 C.F.R. § 600.345(b)(2).

30.     The Secretary may only approve a fishery management plan amendment if such amendment complies with the provisions of the MSA and all other applicable law.  16 U.S.C. § 1854(a)(1).

31.     The Secretary has the responsibility to carry out any fishery management plan or plan amendment approved or prepared by her in accordance with the MSA.  16 U.S.C. § 1854(d).  The Secretary may promulgate such regulations, pursuant to APA rulemaking procedures, as necessary to discharge this responsibility.

**Administrative Procedure Act**

32.     The APA provides for judicial review of final agency action by persons "aggrieved" by such action.  5 U.S.C. § 702.  The actions reviewable under the APA include any "preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final

agency action."  *Id.* § 704.  NMFS' actions in this case, taken pursuant to the MSA, are reviewable under the APA.

33.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C § 706(2)(D).

34.     The APA provides that federal agencies must give "[g]eneral notice" of any "proposed rule making" to the public through publication in the Federal Register.  *Id.* §§ 553, 551(4).  That notice must include (1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.  *Id.* § 553(b).  An agency must consider comments received on a proposed rule.  *Id.* § 553(c).

## FACTUAL ALLEGATIONS

### The BSAI Pacific Cod Fishery

35.     Pacific cod (*Gadus macrocephalus*) is a transoceanic species, distributed widely in the North Pacific, including the eastern Bering Sea and Aleutian Islands.  Pacific cod is not overfished or approaching an overfished condition.  Prior to 2014, BSAI Pacific cod was managed as a single stock throughout the BSAI management area.  In 2014, NMFS and the Council began managing AI and BS cod as separate stocks, establishing separate Total Allowable Catch ("TAC") levels for each geographic area.  The Aleutian Islands TAC is a small percentage of the combined BSAI TAC.  However, the Pacific cod fishery is one of the three

largest directed fisheries in the Aleutian Islands.  Cod from the Aleutian Islands are larger and highly prized fish, and in many cases are marketed separately from Bering Sea cod.

36.     Pacific cod is caught by vessels using multiple gear types, including trawl, longline, pot, and jig components.  Catcher processors are vessels that have processing facilities on board.  Catcher vessels can deliver their catch for processing to motherships, such as the *Katie Ann;* stationary floating processors anchored in specific locations; or processing plants located on land.

37.     The American Fisheries Act, effective in 1999, created exclusive sector allocations of Bering Sea pollock for catcher vessels delivering to shoreplants, trawl catcher processors, and catcher vessels delivering to motherships, including UCB members ("AFA Vessels").  Regulations implementing the American Fisheries Act prohibit AFA Vessels from fishing in the Gulf of Alaska, and also limit their processing of pollock and other groundfish.

38.     In 2007, NMFS adopted Amendment 80 to the BSAI FMP, 72 Fed. Reg. 52,668 (Sept. 14, 2007), which revised the management structure for the BSAI cod fishery.  The Council and NMFS intended Amendment 80 to reduce bycatch and improve fish resource utilization in the BSAI.  To that end, Amendment 80 allocated six BSAI non-pollock groundfish species, including Pacific cod, among trawl catcher processors that were not covered by the American Fisheries Act.  It established a framework for future fishing by the fleet and facilitated the formation of harvesting cooperatives among the vessels.  Amendment 80 also established a Limited Access Privilege Program ("LAPP") for certain trawl catcher processors and limited the ability of those catcher processors to expand their harvesting capacity into other fisheries not managed under a LAPP.  72 Fed. Reg. at 52,671.  GFF members were awarded quota shares established by Amendment 80, including shares for Pacific cod in the BSAI.

39.     In 2007, NMFS also adopted Amendment 85 to the BSAI FMP, which reduced

the allocation of BSAI Pacific cod to trawl sectors from 47 percent to 37.8 percent and further

apportioned the BSAI cod allocation among the different trawl sectors, including the catcher

vessel and catcher processor sectors in which Plaintiffs participate.  72 Fed. Reg. 50788 (Sept. 4,

2007).  No TAC was allocated to shoreside processors.  The Council did not revise the

Amendment 85 sector allocations in 2014 to account for the BS and AI cod split and the sector

allocations established by Amendment 85 continue to apply to the BSAI as a unit.  The sector

allocations of Pacific cod are further allocated by season among those sectors by regulation.  50

C.F.R. § 679(a)(7).

40.     The BSAI Pacific cod trawl sector catch is allocated among three seasons. The

first season, the A season, occurs from January 1 through April 1.  Trawl catcher processors and

catcher vessels typically start fishing for cod in the Aleutian Islands in mid-February and

continue through mid-March.  Trawling is efficient when fish are aggregated and Pacific cod are

generally aggregated in the Aleutian Islands in February and March.  Plaintiffs have difficulty

finding aggregations of cod after mid-April and most of the catch outside February and March is

catch that is incidental to other directed fisheries.

41.     The Pacific cod non-trawl allocation is split between three gear types:  hook-and-

line, pot, and jig gear.  The majority of non-trawl Pacific cod catch in the Aleutians is harvested

by hook-and-line catcher processors.  The hook-and-line allocation is apportioned between an

A season (January 1 through June 10) and a B season (June 10 through December 31).

Historically, non-trawl catch was distributed throughout the year to a much greater extent than

the trawl catch.  However, given the small Aleutian Islands TAC relative to the seasonal

allocations, directed fishing for cod in the Aleutians by all gear types is now typically closed for the year at some point during the A season.

42.     There are two shoreside processing facilities or "shoreplants" in the western Aleutian Islands.  Neither is currently operational for Pacific cod processing.

43.     The Atka shoreplant primarily processes halibut and sablefish, and does not have the equipment to process the harvest from the directed Aleutian Islands Pacific cod fishery.  The Atka shoreplant has not historically participated in the Aleutian Islands Pacific cod fishery.

44.     When the Council first began considering a shoreside processing requirement for the western Aleutians, representatives from Atka testified that they opposed any action that would require on-shore processing because of the lack of cod processing capability at the Atka plant, uncertainty as to the economic viability of doing so, and an established relationship with a floating processor.  Starting in or around 2013, representatives from Atka indicated that they might add the equipment to process cod in the future.  No such equipment was added during the seven years that the Council considered Amendment 113.

45.     The Adak shoreplant has equipment to process Pacific cod but has not been operated continuously over the past decade.  In some years the Adak plant failed to open or closed midseason because the owner viewed Pacific cod processing as uneconomical due to high energy costs, market conditions, employment challenges, product transportation difficulties, and other operational challenges.

46.     The Adak shoreplant has had numerous ownership and operational changes since its establishment in 1999.  Several of these changes occurred between 1999 and 2009, when Adak Fisheries LLC filed for Chapter 11 bankruptcy reorganization.  During the 2010 and 2011 fishing years, financial difficulties for the plant resulted in no cod processing.  In 2012, the

shoreplant, operated by Icicle Seafoods, was open and processed cod.  In 2013, Icicle Seafoods closed its operation in Adak.  The City of Adak then purchased the plant's equipment at auction. The facility was renovated from a head-and-gut operation to a fillet operation.  Adak Cod Cooperative began processing cod in early February 2014 but closed its operations in May 2014.

47.     In early 2015, Premier Harvest LLC purchased equipment from the City of Adak, leased the facility, and began processing crab.  Since that purchase, no cod processing has taken place at the Adak shoreplant.

**Development of Amendment 113**

48.     At its June 2008 meeting, the NPFMC directed Council staff to develop a discussion paper analyzing potential "processing sideboard protections for the two central Aleutian Islands communities."  The processing sideboards would apply to vessels operating in fishery management areas 541 and 542 in the Aleutians under the American Fisheries Act, BSAI crab rationalization and Amendment 80 programs.  A sideboard is a collective limit for all vessels subject to the sideboard.  Vessels subject to a sideboard are allowed to fish or process, in aggregate, up to the sideboard limit but cannot exceed it.  Processing sideboards for non-pollock species had been established for AFA vessels by Congressional action in the American Fisheries Act.  AFA § 211(c)(2)(A).

49.     The Council's June 2008 motion incorporated the following draft problem statement:  "The American Fisheries Act, BSAI crab rationalization program and Amendment 80 program each provide benefits to processing vessels that were intended to protect investments in and dependence on the respective fishery resource.  Each of these rationalization programs has afforded opportunities for consolidation, thus freeing some processing capacity to target the non-rationalized Pacific cod fishery at the expense of other industry and community investments."

50.     In December 2009, an initial draft Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis for a Regulatory Amendment ("2009 EA/RIR/IRFA") was presented to the Council.  The 2009 EA/RIR/IRFA analyzed proposals to establish processing sideboards on processing vessels eligible under the AFA, the BSAI crab rationalization program, and Amendment 80 that received deliveries of Pacific cod harvested in the Aleutian Islands.  Although the Council modified the alternatives under consideration, the problem statement in the 2009 EA/RIR/IRFA remained essentially unchanged from the Council's June 2008 motion.  The 2009 EA/RIR/IRFA stated that "The proposed action is intended to provide such processing limits (sideboards) in the Eastern and Central AI cod fisheries, in order to protect shoreside processing opportunities for Pacific cod." 2009 EA/RIR/IRFA at 2.  The stated "impetus for the proposed action" was to "ensure that the historical share of Pacific cod delivered shoreside, primarily to Adak, would continue." 2009 EA/RIR/IRFA at 16.

51.     In April 2013, the Council received an updated summary of the 2009 EA/RIR/IRFA as part of a discussion paper analyzing the then-proposed Pacific cod TAC split between the Bering Sea and Aleutian Islands.  The April 2013 paper incorporated the 2009 problem statement and repeated that "the impetus for the proposed action is to ensure that the historical share of Pacific cod delivered shoreside, primarily to Adak, would continue."

52.     At its April 2013 meeting, the Council amended the alternatives for consideration, and modified the problem statement to state that "The American Fisheries Act, BSAI Crab Rationalization and Amendment 80 management programs provided benefits to processing vessels that were intended to protect their investments in, and dependence on, the respective fishery resource.  Each of these programs has also afforded participants opportunities for

15

consolidation, allowing for increased participation in the non-rationalized Pacific cod fishery in the Aleutian Islands, thus diminishing the historical share of other industry participants and communities that depend on shorebased processing in the region." The Council member who made the motion stated that it was "time for the Council to provide stability to the shoreside plants." The Council postponed any further action on the alternatives until February 2014.

53.      In February 2014, the Council received another discussion paper from its staff and again modified the alternatives under consideration. The paper repeated once again that the impetus for the proposed action was "to ensure that the historical share of Pacific cod delivered shoreside, primarily to Adak, would continue." At its February 2014 meeting, the Council passed a motion initiating an analysis of "Aleutian Island community protection measures." The Council adopted the same problem statement as that used in April 2013.

54.      In October 2014, the Council added two new options for the proposed action and requested a revised discussion paper.

55.      In February 2015, the Council released a new Initial Review Draft Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis for a Regulatory Amendment ("February 2015 EA/RIR/IRFA") for an "AI Pacific Cod Directed Fishing Allowance and Delivery Requirement" that analyzed the alternatives adopted by the Council in October 2014. The February 2015 EA/RIR/IRFA stated that the intent of the action was to provide some stability to AI shoreplant operations "and the communities dependent on shoreside processing activity."

56.      In February 2015, the Council again added two new options for the proposed action and modified the problem statement to state that "The American Fisheries Act, BSAI Crab Rationalization and Amendment 80 management programs provided benefits to processing

16

vessels that were intended to protect their investments in, and dependence on, the respective

fishery resource.  Each of these programs has also afforded participants opportunities for

consolidation, allowing for increased participation in the non-rationalized Pacific cod fishery in

the Aleutian Islands, thus increasing the risk that the historical share of BSAI cod of other

industry participants and communities that depend on shorebased processing in the region may

be diminished.  The BSAI Pacific cod TAC split and relatively low Pacific cod stock abundance

in the Aleutian Islands further increase the need for community protection."

57.     In October 2015, the Council took final action to create a new "set-aside" for

Aleutian Island processors located on land.  The Council action revised management of the

Pacific cod fishery in the Aleutian Islands by setting aside up to 5,000 metric tons ("mt") of the

Aleutian Islands Pacific cod non-community development quota ("CDQ") TAC for directed-

fishing harvest only by vessels that deliver to western Aleutian Island shoreplants for processing

during the period from January 1 to March 15 if certain requirements are met.

58.     In years when the allowable directed catch of Pacific cod in the Aleutian Islands

is at or below 5,000 mt, no processing at sea is permitted during the period of the set-aside.

During these years, catcher processors are required to deliver their catch to shore, and vessels are

not allowed to fish for the set aside if they process their catch at sea.

59.     In years when the allowable directed catch of Pacific cod is more than 5,000 mt,

the set aside will be 5,000 mt, and directed fishing for cod will be allowed in the "Aleutian

Islands Unrestricted Fishery."  At-sea processing will be allowed as long as the Aleutian Islands

Unrestricted Fishery remains open.  If a vessel has been directed fishing for Aleutian Islands

Pacific cod, but has not yet delivered that Pacific cod for processing when the Aleutian Islands

Unrestricted Fishery closes, but the set-aside is still in effect, it will be required to deliver that

Pacific cod to an Aleutian Islands shoreplant for processing or be in violation of the directed fishing closure.

60.      The Council also limited the amount of A season Pacific cod that can be harvested by trawl catcher vessels in the Bering Sea prior to March 21 to ensure that the set aside is fully and exclusively available to western Aleutian shoreplants.

61.      The set-aside only goes into effect if either the City of Adak or the City of Atka notifies NMFS prior to December 8, 2016, and prior to November 1 in subsequent years, of its intent to process Pacific cod in the upcoming fishing year.  The cities are not required to specify whether their plant will process the entire 5,000 mt set-aside or some lesser amount.  The entire amount is set aside upon receipt of notification from at least one city.  The set-aside is lifted if less than 1,000 metric tons of the set-aside is delivered to the Aleutian Island shoreplants by February 28, or if the harvest set-aside is fully taken before March 15.

62.      On information and belief, neither the City of Adak nor the City of Atka provided the required notice of intent to process Pacific cod in 2017 to NMFS by December 8, 2016.

63.      Amendment 113 and the Final Rule incorporate the Council's final action.  The Secretary approved Amendment 113 on October 17, 2016.  Defendants published the Final Rule implementing Amendment 113 on November 23, 2016.

**Injury to Plaintiffs**

64.      Plaintiffs' abilities to prosecute their traditional fisheries, particularly Aleutian Island Pacific cod, has been and will continue to be severely and immediately impacted by NMFS' decisions to close and restrict federal fisheries in the Aleutian Islands and the Bering Sea pursuant to Amendment 113 and the Final Rule.  Amendment 113 and the Final Rule have severely and immediately impacted Plaintiffs' financial strength and planning abilities,

18

particularly with respect to appropriately allocating resources, which is critical to maintaining an economically viable fishery.

65.     Longline and trawl catcher processors are no longer able to prosecute fisheries that they have operated in for many years.  Catcher vessels are no longer able to deliver to the processor of their choice, and may be forced to deliver to only one shoreside processor in Adak.  If only one shoreplant is operating, catcher vessels will have no ability to bargain for a fair ex-vessel market price for their catch.  Other long-time participants will be unable to participate at all in the Aleutian Islands Pacific cod fishery because the vessels do not have the equipment on board that would allow them to deliver to shoreplants.  The opportunity that some Plaintiffs may have to participate in other federal fisheries does not replace the opportunity to harvest and process Aleutian Islands Pacific cod, which is highly prized and has its own unique market.  Plaintiffs' vessels which participate in the Bering Sea cod fishery are negatively affected by the new restrictions on the A season harvest of cod in the Bering Sea.

## FIRST CLAIM FOR RELIEF

### Violations of the MSA and APA – Illegal Allocation

66.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

67.     The MSA requires that any fishery management plan amendment be consistent with the MSA.  16 U.S.C. §1854.

68.     The MSA establishes a comprehensive system for the conservation and management of domestic marine fisheries, primarily through the regulation of commercial fishing.  16 U.S.C. § 1801(a)(2).  The definition of "fishing" in the MSA does not include on-shore processing.  16 U.S.C. § 1802(16).

69.     The MSA does not give NMFS management authority over processing facilities located on land.

70.     The MSA does not authorize NMFS to allocate shore-based processing privileges.

71.     Regulations promulgated by NMFS define an "allocation" as a "direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals."  50 C.F.R. § 600.325(c)(1).

72.     The Final Rule and Amendment 113 directly and deliberately distribute the opportunity to harvest Pacific cod by prohibiting catcher vessels with current sector allocations of Pacific cod TAC from harvesting that allocation in the Aleutian Islands unless they deliver to shoreplants in the Aleutians, effectively redistributing the opportunity to participate in the Aleutian Pacific cod fishery.

73.     NMFS did not comply with the MSA's requirements for allocating privileges to harvest fish.

74.     The MSA does not authorize NMFS to allocate privileges to harvest fish to fishing communities unless the community demonstrates eligibility to participate in a LAPP. The Council and NMFS did not comply with statutory procedures for creation of a LAPP in the development of Amendment 113.

75.     The Final Rule and Amendment 113 directly and deliberately distribute the opportunity to process Pacific cod by redistributing it from catcher processor vessels and floating processors to specific shoreplants, effectively redistributing the opportunity to participate in the Aleutian Pacific cod fishery.

76.     The Final Rule and Amendment 113 allocate shore-based processing privileges, an activity not authorized by the MSA.

20

77.     The APA prohibits agency action that is in excess of statutory jurisdiction,

authority or limitations, or is arbitrary, capricious, or otherwise not in accordance with law.

5 U.S.C. §706.  The Final Rule and Amendment 113 are arbitrary and capricious and otherwise

not in accordance with the MSA and its implementing regulations, and are therefore prohibited

agency actions under the APA.

78.     Defendants are required to disapprove a fishery management plan amendment to

the extent it is inconsistent with the MSA or other applicable law.  By promulgating the Final

Rule and approving Amendment 113, Defendants violated the MSA and the APA.  These actions

have caused or threaten to cause serious prejudice and injury to Plaintiffs' rights and interests,

are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested

below.

## SECOND CLAIM FOR RELIEF

## Violations of MSA National Standard 4 and the APA

79.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

in the preceding paragraphs.

80.     National Standard 4 provides that measures that "allocate or assign" fishing

privileges must be "(A) fair and equitable to all such fishermen; (B) reasonably calculated to

promote conservation; and (C) carried out in such manner that no particular individual,

corporation, or other entity acquires an excessive share of such privileges."  16 U.S.C.

§ 1851(a)(4).

81.     NMFS stated in the preamble to the Final Rule that "[t]his final rule allocates

fishing privileges for the Aleutian Islands Pacific cod through the establishment of a set-aside for

a portion of the Aleutian Islands Pacific cod TAC available for harvest by vessels directed

fishing for Aleutian Islands Pacific cod and that deliver their catch to Aleutian Islands

shoreplants . . . ." 81 Fed. Reg. 8,4446.  NMFS also stated that "the set-aside does allocate

Aleutian Islands Pacific cod among an inshore sector (those vessels that deliver their catch at sea

or that deliver their catch to offshore processors for processing). . . ." *Id.* at 8,4453.

82.     The Final Rule and Amendment 113 are unfair and inequitable to long time off-

shore participants in the Pacific cod fishery.  Longline and trawl catcher processors are no longer

able to prosecute fisheries that they have operated in for many years.  Catcher vessels are no

longer able to deliver to the processor of their choice, and some long-time participants will be

unable to participate at all because they cannot deliver to shoreplants or negotiate a price for their

catch that supports continued participation in the Pacific cod fishery.

83.     NMFS failed to explain, based on the facts, how the harms to historical

participants in off-shore processing and harvesting will be offset by any net benefits to either

Atka or Adak.

84.     The Final Rule and Amendment 113 are not reasonably calculated to promote

conservation.  NMFS failed to articulate a lawful conservation purpose for its actions.

85.     Only one shoreplant located in Adak has the capacity to process Pacific cod from

the directed cod fishery.  The Final Rule and Amendment 113 will therefore be carried out in

such a way that one particular entity or corporation will receive an excessive share.

86.     Amendment 113 and the Final Rule require vessels to deliver their catch to

shoreplants, but there is no requirement for the shoreplant to accept such deliveries.

87.     The Final Rule and Amendment 113 create conditions in the Aleutian Islands

Pacific cod fishery fostering inordinate control by buyers that would not otherwise exist.

88.     The Final Rule and Amendment 113 violate the MSA and National Standard 4 and are arbitrary and capricious.   The Final Rule and Amendment 113 have caused or threaten to cause serious prejudice and injury to Plaintiffs' rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

### THIRD CLAIM FOR RELIEF

### Violations of MSA National Standard 5 and the APA

89.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

90.     National Standard 5 provides that conservation and management measures "shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."   16 U.S.C. § 1851(a)(5).

91.     Amendment 113 and the Final Rule create inefficiencies in the Pacific cod fishery that did not previously exist and have no purpose other than economic allocation.

92.     The Aleutian cod fishery is typically a pulse fishery, with cod aggregating in large volumes early in the year and then moving to other areas or dispersing.   Vessels that are unable to fish in the Aleutian Islands due to the restrictions in the Final Rule will not be able to re-enter the fishery after the removal of the set-aside due to practical barriers such as the long distances and necessary preparation time.   Some historical participants in the fishery are unable to deliver to shore-based processors because their vessels lack the proper storage equipment.   The Final Rule will likely strand fish that would have otherwise been harvested and may decrease net benefits to the nation from the Pacific cod directed fishery.

93.     If a vessel has been directed fishing for Aleutian Islands Pacific cod as part of the Aleutian Islands Unrestricted Fishery, but has not yet delivered that Pacific cod for processing

when the Aleutian Islands Unrestricted Fishery closes, and the harvest set aside is still in effect, the Final Rule and Amendment 113 require it to deliver that Pacific cod to an Aleutian Islands shoreplant for processing.  The Unrestricted Fishery can close with very little warning when TAC limits are reached.  Catcher vessels may be hundreds of miles away from a shoreside processor when the closure announcement is made, and not equipped to store fish onboard in order to make the journey to the shoreplant.  Catcher vessels are prohibited from discarding such fish at sea.

94.     Under the Final Rule, any circumstance in the Aleutian Islands that limits catcher vessel harvest and delivery, such as shortage of processing capacity, unwillingness of catcher vessels to deliver to only one processor, or weather conditions precluding delivery to shore will result in unharvested cod that would have otherwise been harvested.  Cod which otherwise would have been harvested in the Bering Sea will likely not be caught due to the Final Rule's restrictions on the total amount of A season Pacific cod that can be harvested by trawl catcher vessels prior to March 21.  The Final Rule will likely strand fish that would have otherwise been processed at-sea and may decrease net benefits to the nation from the Pacific cod fishery. The Final Rule also presents the potential that the Pacific cod fishery will not achieve optimum yield, a violation of National Standard 1.

95.     Amendment 113 and the Final Rule arbitrarily and capriciously limit the markets available to catcher vessels seeking to land their catch of Pacific cod, creating unfair bargaining positions between vessels and on-shore processors and the potential for an on-shore plant to exercise its monopsony power to reduce prices.  These uncompetitive outcomes are prohibited by the MSA and National Standard 5.  16 U.S.C. § 1851(a)(4)(C).

96. The evidence demonstrates that the sole purpose of Amendment 113 and the Final Rule is to redirect processing revenue from offshore participants to an on-shore processor.

97. The Final Rule and Amendment 113 violate the MSA, National Standard 5, and are arbitrary and capricious. The Final Rule and Amendment 113 have caused or threaten to cause serious prejudice and injury to Plaintiffs' rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

## FOURTH CLAIM FOR RELIEF

### Violation of MSA National Standard 8 and the APA

98. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

99. National Standard 8 provides that conservation and management measures "shall, consistent with the conservation requirements" of the MSA, "take into account the importance of fishery resources to fishing communities" by utilizing economic and social data that meet National Standard Two's best scientific information available requirement "in order to (A) provide for the sustained participation of such communities and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8).

100. NMFS has not articulated a conservation purpose that complies with the MSA's conservation directives.

101. Regulations promulgated by NMFS state that this standard "does not constitute a basis for allocating resources to a specific fishing community nor for providing preferential treatment based on residence in a fishing community." 50 C.F.R. § 600.345(b)(2). The evidence demonstrates that the harvest set-aside can reasonably be expected to benefit only one community, Adak, in violation of this prohibition.

25

102.     The purported economic benefits of Amendment 113 and the Final Rule to Aleutian communities are illusory.  The Council's analyses indicated that Amendment 113 and the Final Rule are likely to result in net negative or at best neutral economic impacts to Aleutian communities.  For example, Adak in particular acts as a port of embarkation and disembarkation for catcher processors and catcher vessels and derives economic benefits from goods and services supplied to those vessels.  By reducing the number of visits by vessels to Adak, the net benefit of Amendment 113 and the Final Rule to Adak from the Pacific cod fishery will either decrease or be net neutral.

103.     NMFS did not explain, based on the facts, how it was reasonable to expect benefits to communities to flow from Amendment 113 and the Final Rule when one shoreplant has never processed or received cod from the directed fishery, and the other has a long history of sporadic and unsustainable operations.

104.     NMFS did not explain, based on the facts, its assumption that it would be economically viable for both Adak and Atka processors to operate under the set-aside.  Nor did NMFS explain how simultaneously operating processors would benefit the communities of Adak and Atka.

105.     The Final Rule and Amendment 113 violate the MSA and National Standard 8 and are arbitrary and capricious.  The Final Rule and Amendment 113 have caused or threaten to cause serious prejudice and injury to Plaintiffs' rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

## FIFTH CLAIM FOR RELIEF

### Violations of the APA – Failure to Articulate a Rational Basis

106.    The APA requires NMFS to examine the relevant data and articulate a satisfactory explanation for its decision to create an Aleutian Islands catch set-aside for on-shore processors, including a rational connection between the evidence before the agency and the decisions it made.

107.    NMFS did not explain how the Final Rule and Amendment 113 comply with the requirements of the MSA, its implementing regulations, and National Standards 1, 4, 5 and 8.

108.    Amendment 113 and the Final Rule are based on a number of improper assumptions unsupported by the facts.  NMFS failed to explain a rational basis, supported by the facts, for its conclusions in at least the following respects:

a.      NMFS' analysis of the purported causes of the economic instability of Aleutian Islands shoreplants, and the projected mitigating impacts of Amendment 113 and the Final Rule, are not supported by the facts;

b.      NMFS and the Council inaccurately assumed that the Adak plant's historical share of cod processing has been decreasing (in those years when the plant was open for processing);

c.      NMFS and the Council inaccurately assumed that processing Aleutian Islands Pacific cod at Aleutian Islands shoreplants is economically viable;

d.      The evidence relied upon by NMFS does not present an accurate picture of the relative participation and history of all participants in the BSAI Pacific cod fishery; and

e.      NMFS failed to conduct an objective and thorough assessment of the Aleutian Pacific cod fishery, its participants, and their relative dependence on the fishery.

109.    Accordingly, NMFS failed to provide a rational basis, supported by the facts, for its decision to adopt and implement Amendment 113 and the Final Rule.  Amendment 113 and

the Final Rule are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law.

110.    The Final Rule and Amendment 113 have caused or threaten to cause serious prejudice and injury to Plaintiffs' rights and interests, are reviewable under the APA, 5 U.S.C. §§ 701-706, and entitle Plaintiffs to the relief requested below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.    For expedited consideration of this matter pursuant to 16 U.S.C. §1855(f)(4);

B.    For a judicial declaration that Defendants have violated the MSA and APA as described above because Amendment 113 and the Final Rule were adopted without observing proper procedures, violate at least National Standards 4, 5, and 8, and are arbitrary, capricious, and an abuse of discretion, not in accordance with law, and in excess of statutory jurisdiction, authority or limitations;

C.    For an order vacating Amendment 113 and the Final Rule;

D.    For an order remanding Amendment 113 and the Final Rule so that the Defendants may reconsider them based on the Court's findings and rulings;

E.    That the Court maintain jurisdiction over this action until Defendants are in compliance with the MSA and APA and every order of this Court;

F.    For an award of reasonable attorneys' fees and costs of suit; and

G.    For such other and further relief as the Court may deem just and proper.

Dated:  December ___, 2016

> _/s/ Linda R. Larson_
> Linda R. Larson, D.D.C.  Bar No. MI00059
> Nossaman LLP
> 801 Second Avenue, Suite 800
> Seattle, WA 98104
> Telephone:   206.489.5632
> Facsimile:   206.489.5501
> llarson@nossaman.com
>
> Ashley J. Remillard, CA Bar No. 252374
> _Pro Hac Vice Application pending_
> Nossaman LLP
> 18101 Von Karman Avenue, Suite 1800
> Irvine, CA 92612
> Telephone:   949.833.7800
> Facsimile:   949.833.7878
> aremillard@nossaman.com