**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE GROUNDFISH FORUM; UNITED CATCHER BOATS; B & N FISHERIES COMPANY; KATIE ANN LLC, | |
| Plaintiffs, | |
| v. | |
| WILBUR L. ROSS,[1] in his official capacity as Secretary of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE, | Case No: 1:16-cv-02495-CKK |
| Defendants, | ORAL ARGUMENT REQUESTED |
| and | |
| THE CITY OF ADAK, ALASKA; THE CITY OF ATKA, ALASKA; THE ADAK COMMUNITY DEVELOPMENT CORPORATION; THE ALEUTIAN PRIBILOF ISLAND COMMUNITY DEVELOPMENT ASSOCIATION; and THE ALEUT CORPORATION, | |
| Intervenor-Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), U.S. Secretary of Commerce ("Secretary") Wilbur L. Ross is automatically substituted for Penny Pritzker, former Secretary.

56080387

## TABLE OF CONTENTS

Page:

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL BACKGROUND ................................................................................... 3

III.   STATEMENT OF FACTS .................................................................................. 5

       A.     The Aleutian Islands Pacific cod fishery. ............................................... 5

       B.     Fishery management changes result in fewer fish available to all
              participants in the Aleutian Islands. ....................................................... 8

       C.     Only one shoreplant in the Aleutians has the capacity to process
              fish from the directed cod fishery. ......................................................... 8

              1.     Adak ............................................................................................. 9

              2.     Atka ............................................................................................ 10

       D.     The Council struggled for eight years to find a rationale for
              Amendment 113. .................................................................................... 11

       E.     Amendment 113 restricts offshore fishing and processing for the
              benefit of one onshore processor. ......................................................... 17

IV.    ARGUMENT ..................................................................................................... 20

       A.     Standing ................................................................................................. 20

              1.     Constitutional standing ............................................................. 20

              2.     Prudential standing .................................................................... 22

       B.     Standard of Review ............................................................................... 22

       C.     Amendment 113 is an unlawful onshore processing privilege. ............ 24

              1.     Onshore processing privileges are unlawful. ............................ 24

              2.     Harvesting privileges to onshore processors can be lawful. ...... 25

              3.     Amendment 113 is not a lawful harvest privilege, and is
                     instead an unlawful onshore processing privilege. .................... 26

56080387

D.    By relying on critical assumptions not supported by substantial evidence, NMFS has not articulated a rational basis for Amendment 113 .......................................................................... 27

E.    Amendment 113 violates National Standard 8. ............................... 32

    1.    Amendment 113 does not have a conservation purpose. .................. 33

    2.    NMFS violated National Standard 8 by allocating resources to only one fishing community. ......................................... 35

    3.    Even if Amendment 113 could be deemed to serve a conservation purpose, NMFS violated National Standard 8 because the purported economic benefits of Amendment 113 are illusory. ............................................................... 37

F.    Amendment 113 violates National Standard 4. ............................... 38

    1.    Amendment 113 allocates fishing privileges to vessels delivering to shoreplants. .................................................... 39

    2.    Amendment 113 is not fair and equitable to long time offshore participants in the cod fishery. ............................................... 40

    3.    Amendment 113 does not promote conservation. ............................ 41

    4.    Amendment 113 creates noncompetitive conditions in the AI cod fishery that would otherwise not exist. .................................. 41

G.    Amendment 113 violates National Standard 5. ............................... 42

V.    REQUESTED RELIEF ......................................................................... 44

VI.    CONCLUSION ................................................................................... 45

56080387

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ace Lobster Co. v. Evans*,
  165 F. Supp. 2d 148 (D.R.I. 2001)............................................................................39

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001)................................................................................44

*\*American Tunaboat Ass'n v. Baldridge*,
  738 F.2d 1013 (9th Cir. 1984) ..........................................................................28, 32

*Anglers Conservation Network v. Pritzker*,
  139 F. Supp. 3d 102 (D.D.C. 2015)..........................................................................6

*Arizona Cattlegrowers' Association v. U.S. Fish and Wildlife Service*,
  273 F.3d 1229 (9th Cir. 2001) .................................................................................32

*Association of Data Processing Service Organizations, Inc. v. Camp*,
  397 U.S. 150 (1970)..................................................................................................22

*Back Country Horsemen of Am. v. Johanns*,
  424 F. Supp. 2d 89 (D.D.C. 2006) ...........................................................................23

*Baltimore Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983)....................................................................................................23

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................................................20, 22

*Blue Ocean Inst. v. Gutierrez*,
  585 F.Supp.2d 36 (D.D.C. 2008) ..............................................................................35

*C & W Fish Co. v. Fox, Jr.*,
  931 F.2d 1556 (D.C. Cir. 1991) .................................................................................5

*Chinatown Neighborhood Ass'n v. Harris*,
  33 F.Supp.3d 1085 (N.D. Cal. 2014) *aff'd sub nom. Chinatown Neighborhood
  Ass'n v. Harris*, 794 F.3d 1136 (9th Cir. 2015), *cert. denied*, 136 S.Ct. 2448
  (2016)........................................................................................................................22

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971), *abrogated on other grounds by Califano v. Sanders*, 430
  U.S. 99 (1977)...........................................................................................................23

56080387

*Clinton v. City of New York*,
  524 U.S. 417 (1998)...................................................................................21

*Com. of Mass. by Div. of Marine Fisheries v. Daley*,
  10 F. Supp. 2d 74 (D. Mass. 1998) ...........................................................36

*Massachusetts ex rel. Div. of Marine Fisheries v. Daley*,
  170 F.3d 23 (1st Cir. 1999)........................................................................37

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003)...................................................................................44

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)...................................................................................24

*Fed. Power Comm'n v. Florida Power & Light Co.*,
  404 U.S. 453 (1972)...................................................................................23

*Flaherty v. Bryson*,
  850 F. Supp. 2d 38 (D.D.C. 2012) .............................................................34

*Fund for Animals, Inc. v. Norton*,
  322 F.3d 728 (D.C. Cir. 2003) ...................................................................20

*\*Guindon v. Pritzker*,
  31 F. Supp. 3d 169 (D.D.C. 2014) .......................................................36, 39

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983) ...................................................................23

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).....................................................................................23

*N. Carolina Fisheries Ass'n, Inc. v. Daley*,
  16 F. Supp. 2d 647 (E.D. Va. 1997) ..........................................................38

*N. Carolina Fisheries Ass'n, Inc. v. Daley*,
  27 F. Supp. 2d 650 (E.D. Va. 1998) ..........................................................38

*N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*,
  518 F. Supp. 2d 62 (D.D.C. 2007) .............................................................35

*Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*,
  71 F. Supp. 3d 35 (D.D.C. 2014) ...............................................................37

*National Coal Association v. Hodel*,
  825 F.2d 523 (D.C. Cir. 1987) ...................................................................22

iv

*Natural Res. Def. Council, Inc. v. Daley,
209 F.3d 747 (D.C. Cir. 2000) ......................................................................33, 35

Oceana, Inc. v. Bryson,
940 F. Supp. 2d 1029 (N.D. Cal. 2013) ...............................................................34

Pac. Coast Fed'n Of Fishermen's Ass'n v. Locke,
No. C 10-04790 CRB, 2011 WL 3443533 (N.D. Cal. Aug. 5, 2011)....................39

*Portland General Elec. Co. v. Bonneville Power Admin.,
501 F.3d 1009 (9th Cir. 2007) .............................................................................24

Protocols, LLC v. Leavitt,
549 F.3d 1294 (10th Cir. 2008) ...........................................................................21

Sierra Club v. Mainella,
459 F. Supp. 2d 76 (D.D.C. 2006) .......................................................................23

Sierra Club v. Van Antwerp,
719 F. Supp. 2d 77 (D.D.C. 2010) .......................................................................44

*Texas v. Crabtree,
948 F. Supp. 2d 676 (S.D. Tex. 2013) ......................................................39, 41, 42

United States v. Ron Pair Enterprises, Inc.,
489 U.S. 235 (1989)...........................................................................................24

Wyoming v. Dept. of Interior,
No. 2:15-CV-043-SWS, Case No. 2:15-CV-041-SWS, 2016 WL 3509415 (D.
Wyo. June 21, 2016) ...........................................................................................24

**Federal Statutes**

5 U.S.C. § 706(2)(A).............................................................................23, 27, 44

*5 U.S.C. § 706(2)(C) ..................................................................................2, 3, 23

*16 U.S.C. § 1801 et seq. ...................................................................... passim

16 U.S.C. § 1802(5) ............................................................................................33

16 U.S.C. § 1802(15) ....................................................................................24, 33

16 U.S.C. § 1802(17) ..........................................................................................26

*16 U.S.C. § 1851 .......................................................................................... passim

16 U.S.C. § 1852................................................................................................4, 14

v

16 U.S.C. § 1853 ..................................................................................................22, 34, 38

16 U.S.C. § 1853a ...............................................................................................................27

16 U.S.C. § 1854(a) .............................................................................................................4

16 U.S.C. § 1854(b) .............................................................................................................4

16 U.S.C. § 1855(f)(1) .......................................................................................................22

**Regulations**

50 C.F.R. § 600.325(c)(1) ..................................................................................................39

50 C.F.R. § 600.325(c)(3)(iii) ...........................................................................................41

50 C.F.R. § 600.330(b)(2)(i) .............................................................................................42

50 C.F.R. § 600.345(b)(2) ..............................................................................................5, 33

50 C.F.R. § 679.2 .................................................................................................................6

*81 Fed. Reg. 50444 (Aug. 1, 2016) ......................................................................... *passim*

*81 Fed. Reg. 84434 (Nov. 23, 2016) ......................................................................... *passim*

**Constitutional Provisions**

U.S. Const. Article III ...................................................................................................20, 21

56080387

## TABLE OF ACRONYMS

*This table contains a list of acronyms and abbreviations used in this brief.*

| | |
|---|---|
| AR | Administrative Record |
| AFA | American Fisheries Act |
| AI | Aleutian Islands |
| A80 | Amendment 80 |
| APA | Administrative Procedure Act |
| BS | Bering Sea |
| BSAI | Bering Sea Aleutian Islands |
| Council, NPFMC | North Pacific Fishery Management Council |
| CP | Catcher-processor vessel |
| CV | Catcher vessel |
| DFA | Directed Fishing Allowance |
| EA/RIR/IRFA | Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis |
| FMP | Fishery Management Plan |
| GHL | Guideline Harvest Level |
| ICA | Incidental Catch Allowance |
| LAPP | Limited Access Privilege Program |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| mt | metric tons |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| PSC | Prohibited Species Catch |
| SSC | Science and Statistical Committee |
| TACs | Total Allowable Catch Limits |

## I.      INTRODUCTION

Plaintiffs The Groundfish Forum; United Catcher Boats; B & N Fisheries Company; and Katie Ann LLC (collectively, "Plaintiffs") challenge Amendment 113 to the Fishery Management Plan ("FMP") for the Bering Sea/Aleutian Islands ("BSAI") Groundfish Fishery and its implementing regulations ("Amendment 113"), as set forth in the final rule promulgated on November 23, 2016 by Defendants Secretary of Commerce Penny Pritzker, the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS") (collectively "Federal Defendants") entitled *Fisheries of the Exclusive Economic Zone off Alaska; Bering Sea and Aleutian Islands Management Area; American Fisheries Act; Amendment 113,* 81 Fed. Reg. 84434 (Nov. 23, 2016) ("the Final Rule").

For decades, vessels from Plaintiffs United Catcher Boats and B & N Fisheries have caught Pacific cod in the Aleutian Islands ("AI") and delivered their catch to the at-sea or on-shore processor of their choice.  For decades, vessels from Plaintiffs The Groundfish Forum and Katie Ann LLC have caught Pacific cod, received cod from other vessels, and processed this catch at-sea.  This long-established, competitive, and stable fishery was upended by Amendment 113 and the Final Rule, which establish an unprecedented and statutorily unauthorized "harvest set-aside" to unlawfully direct a portion of the Pacific cod harvest to a single on-shore processing plant that has been closed since 2014.  At times when the harvest set-aside is fully in effect, at-sea processing of Pacific cod is prohibited, and only those vessels that are able to deliver their cod to the onshore processor are allowed to fish.  In the highly regulated North Pacific groundfish fisheries, this lost opportunity is truly foregone; Plaintiffs cannot make up for this loss by moving to alternative fishing grounds or finding other markets for their catch.  The record shows that this action was taken solely for the purpose of attempting to shore up a single onshore processing facility in Adak, Alaska, which has proven to be uneconomical and unsustainable even when processing of amounts of cod well above the amount of the harvest set-aside, despite attempts by several different owners and operators.

1

Amendment 113 and the Final Rule are unlawful and invalid for several reasons.  First, Federal Defendants simply do not have authority under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §1801 *et seq*. ("MSA"), to take this action. Federal Defendants are limited by the MSA to regulating "fishing," which is defined to include only activities taking place at sea.  The Final Rule's creation of an exclusive processing privilege for processors located on land exceeds the agency's authority under the MSA and is therefore invalid.  Under the Administrative Procedure Act ("APA"), agency action must be set aside if it was taken "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. §706(2)(C).

Second, even if Federal Defendants had statutory authority to take this action, they acted arbitrarily and capriciously in doing so because the entire scheme rests upon completely unfounded assumptions and conclusions, which are not only unsupported but contradicted by the facts.  Under the APA, agency action must be set aside if the agency has failed to offer a rational basis for its decision and offered an explanation for its decision that runs counter to the evidence before the agency.  5 U.S.C. §706(2)(C).  Here, Federal Defendants irrationally concluded that the Adak shoreplant's inability to operate continuously was the result of competition from off shore participants such as Plaintiffs.  In fact, agency analyses and other evidence in the record demonstrate that the Adak shoreplant did not have a sustainable business due to the unique challenges of its remote location, including low profit margins, limited proximity to other fisheries, and high operating costs.  The only other shoreplant in the action area, located in Atka, Alaska, has never processed Pacific cod and does not have the equipment to do so.

Notwithstanding these facts and their own analyses, Federal Defendants freely admit that this entire action is based upon the unsupported assumption that shore-based processing in the Aleutian Islands is economically sustainable.  The record overwhelming demonstrates that this assumption, as well as the assumption that the harvest set aside will result in economic benefits to Aleutian communities, were not reasonable and supported by the facts.

Third, Amendment 113 is not consistent with several of the MSA's National Standards for fishery management.  Under the APA, agency action must be set aside if it is "an abuse of

2

discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(C).  Federal Defendants violated National Standard 8 because, without articulating a conservation purpose that complies with the MSA, the agency allocated resources to a specific fishing community.  Although the Final Rule ostensibly benefits the two Aleutian communities of Adak and Atka, Atka has been unable to modify its plant to process cod during the eight years that this action was under consideration.  Only Adak can conceivably utilize the harvest set-aside.  Federal Defendants violated National Standard 4 because it creates an unfair and inequitable allocation of fishing privileges for economic, not conservation, purposes.  In addition, by creating conditions in which a single shoreplant unilaterally dictates which harvesters it will accept deliveries from, as well as the price of the harvesters' catch, the Final Rule violates National Standard 4's prohibition against the creation of inordinate control by a buyer.  Finally, the Final Rule violates National Standard 5 because, by prescribing a single recipient for deliveries of catches from the fishery and foreclosing processing at sea, it introduces uncertainty and gross inefficiencies into a previously well-managed fishery for the sole purpose of economic redistribution.

Amendment 113 and the Final Rule exceed Federal Defendants' statutory authority, violate the MSA, and are arbitrary and capricious.  "The obvious irony here is that this action in attempting to protect and benefit [the Adak shoreplant] jeopardizes the very fishery that the beneficiary of this action depends on."  AR3000529.  Plaintiffs move for summary judgment invalidating Amendment 113 and the Final Rule.

## II.        LEGAL BACKGROUND

Congress enacted the MSA, among other purposes, "to conserve and manage the fishery resources found off the coasts of the United States," "to promote domestic commercial and recreational fishing under sound conservation and management principles," and "to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery."  16 U.S.C. § 1801(b)(1), (3)-(4).  The MSA created eight regional fishery

management councils, including the North Pacific Fishery Management Council ("Council" or "NPFMC"), whose actions are at issue in this case. 16 U.S.C. § 1852. These councils must develop, and submit to the Secretary for approval, FMPs and "amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed)." 16 U.S.C. § 1854(a)(1)-(3), 16 U.S.C. § 1852(h)(1). All FMPs and implementing regulations prepared by the regional fishery management councils are subject to final review and approval by NMFS. The MSA requires an FMP and its amendments, and any regulations promulgated to implement such plans or amendments, to be consistent with the MSA and "other applicable law." 16 U.S.C. § 1854(a) and (b).

FMPs must comply with ten "national standards" under the MSA. Four are at issue in this case:

National Standard 1 provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

Under National Standard 4, "[c]onservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4),

National Standard 5 states that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." 16 U.S.C. § 1851(a)(5).

Under National Standard 8, "[c]onservation and management measures shall, consistent with the conservation requirements of [the MSA]…, take into account the importance of fishery resources to fishing communities by utilizing economic and social data" that meet National

4

Standard 2's best scientific information available requirement in order to "(A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). National Standard 8 "does not constitute a basis for allocating resources to a specific fishing community nor for providing preferential treatment based on residence in a fishing community." 50 C.F.R. § 600.345(b)(2).

In the context of reviewing amendments to FMPs, a court's task "is not to review *de novo* whether the amendment complies with [the National] [S]tandards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co. v. Fox, Jr.,* 931 F.2d 1556, 1562 (D.C. Cir. 1991).

## III.      STATEMENT OF FACTS

### A.      The Aleutian Islands Pacific cod fishery.

Pacific cod (*Gadus microcephalus*) is a transoceanic species, distributed widely over the eastern Bering Sea ("BS") as well as the Aleutian Islands. Commercial fishing for Pacific cod takes place in federal fisheries from 3 to 200 miles offshore of Alaska, as well as in a state-managed guideline harvest level ("GHL") fishery in waters inside of 3 miles. Administrative Record ("AR") 4015508; AR4002037. One of the most valuable commercial species in the North Pacific, the Pacific cod stock in the BSAI federal fisheries management area is neither overfished nor approaching an overfished condition. AR4002036; AR4012567. Pacific cod is harvested by vessels using a variety of gear, including trawl, hook-and-line, jigs, and pots. AR4015506, AR4012567.

The Aleutian Islands cod fishery is a dynamic pulse fishery that takes place primarily in the winter months. AR4002005-08; AR3004853. Fishing efforts generally begin in January, increase in late February with a peak in mid-March, followed by a dramatic decline over the next few weeks. AR4002006. Pacific cod aggregate in the Aleutian Islands during this time period, which allows efficient harvest by trawl vessels. AR4002007; AR4015551. Catch of cod outside

of this period is mostly incidental catch in other fisheries.[2]  AR4002007.  Fishermen report that it is hard to find aggregations of cod in sufficient amounts to warrant trawling after mid-April. AR4002007; AR3004687.  In addition, the quality of cod caught after spawning in late March and April begins to decline, decreasing its value.  AR4015545.

Catcher-processors ("CPs"), including members of Plaintiffs Groundfish Forum and the *Katie Ann*, fish for cod and process the catch on board at sea.  AR4012567.  Catcher vessels ("CVs"), including Plaintiff United Catcher Boats' member vessels and those owned by Plaintiff B & N Fisheries, harvest and deliver cod for processing to several types of processors, including CPs acting as "motherships," stationary floating processors, and processing plants located on shore.[3]  AR4015530.  Seattle is the homeport for the largest number of vessels participating in the AI Pacific cod fishery.  AR4015534-35.  AI cod has historically been processed by both offshore vessels and shoreplants.  AR4002008.

The BSAI Pacific cod fishery is one of the few remaining primary fisheries in the BSAI not managed through a rationalization program.  AR3001520.  Rationalization or "catch share" programs assign fishing privileges in a fishery to specific vessels, eliminating the "race for fish" and allowing efficient and cooperative harvesting.  Some, but not all, long-time offshore participants in the Aleutian Islands cod fishery are also eligible to participate in rationalized fisheries for other species.  The American Fisheries Act ("AFA"), effective in 1999, exclusively allocated the North Pacific pollock fishery to a sector comprised of certain specified trawl CVs, motherships, and CPs, including members of Plaintiffs United Catcher Boats, B & N Fisheries' vessels, and the *Katie Ann*.  AR3000615; Decl. of B. Paine ("Paine Decl."), ¶ 5.  This fleet is generally homeported in Seattle.  These vessels are also long-time participants in the Aleutian

---

[2] Incidental catch is the part of the catch that was not originally targeted, but was caught and retained anyway.  *Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 108 (D.D.C. 2015).

[3] Motherships are mobile floating processors.  AR300617.  Federal regulations define a mothership as "a vessel that receives and processes groundfish from other vessels."  50 C.F.R. § 679.2.

Islands cod fishery.  *E.g.,* Decl. of M. Hyde ("Hyde Decl."), ¶ 4(a).  AFA trawl CVs harvest an average of 85 percent of the total amount of cod caught by CVs in the Aleutian Islands. AR4015529.

In 2008, NMFS implemented Amendment 80 to the FMP for the BSAI Groundfish Fishery, which rationalized the non-pollock groundfish trawl fishery.  The amendment provided an allocation of the Total Allowable Catch limits ("TACs") for six groundfish species, including Pacific cod, to specific trawl CPs not eligible under the AFA.  Members of Plaintiff Groundfish Forum make up the Amendment 80 or "A80" sector.  Amendment 80 created quota share for these vessels, facilitated the development of cooperatives among the vessels, and provided for a competitive fishery among Amendment 80 vessels not entering a cooperative.  AR4015521. A80 vessels also have a long history of participation in the Pacific cod fishery.  Decl. of T. Loomis ("Loomis Decl.") ¶ 4.  This fleet is also primarily homeported in Seattle.

Both the AFA and Amendment 80 sectors are subject to specific "sideboard" restrictions. AR4015521.  Sideboards limit a sector's harvesting or processing activity to its historical share when excess capacity is likely due to the sector's participation in a rationalization program.  The intent is to prevent the rationalized sector from expanding its share in other fisheries due to this excess capacity.  AR3000660.  A sideboard is a collective limit for all vessels subject to it; it does not represent a guaranteed allocation of harvest or processing privileges.  AR3000615.

In 2008, NMFS implemented Amendment 85, which reallocated the catch of BSAI cod among historical at-sea participants.  The largest BSAI cod allocation is held by hook-and-line CPs known as "freezer longliners."  AR4015506.  Amendment 85 reduced the allocation of BSAI cod to trawl sectors from 47 to 37.8 percent.  AR4015486.  The Amendment 80 sector lost a substantial percentage of its previous average cod catch through Amendment 85.  AR3000532; AR3001029.

**B.      Fishery management changes result in fewer fish available to all participants in the Aleutian Islands.**

BSAI Pacific cod was managed as a single stock until 2014, when NMFS established separate TAC limits for the BS and AI and began managing cod as two separate stocks. AR4015505.  Studies previously found that cod in the two areas are genetically distinct, with cod in the AI generally larger and longer than those in the BS.[4]  AR3000302-03.  Prior to the management split, NMFS attributed approximately 16% of total BSAI cod biomass to the Aleutian Island; however, subsequent studies showed that the actual distribution in the AI is in the range of 7 to 9 percent.  81 Fed. Reg. 50444, 50449 (Aug. 1, 2016).  In addition, the biomass in the AI declined from 2000 until 2014, when it appeared to stabilize.  81 Fed. Reg. 50444, 50449 (Aug. 1, 2016).  The declining biomass and the TAC split resulted in a substantial decrease in the amount of cod available for harvesting and processing in the Aleutian Islands.  *Id.* at 50449; Paine Decl. ¶ 9.  Importantly, although NMFS began managing the two stocks differently from a biological standpoint, vessels authorized to fish for cod are still allowed to fish for both stocks of cod and may take their catch limit ("sector allocations") in either the BS or AI. AR4000093; Paine Decl. ¶ 8.

Taken together, these management measures resulted in lower TAC levels in the Al cod fishery, causing lower catch levels for all historical participants.  AR4015504 ("[S]ince the BS and AI TAC split in 2014, there is not enough TAC for all sectors to prosecute the AI Pacific cod fishery at their historical levels."); AR4015485 (substantial decrease in retained catch in the AI since 2011; trawl CV and CP sectors "have seen a dramatic decline in AI Pacific cod" harvest); Paine Decl. ¶ 9; Decl. of J. Downing ("Downing Decl."), ¶ 7.

**C.      Only one shoreplant in the Aleutians has the capacity to process fish from the directed cod fishery.**

Although Amendment 113 purports to benefit all Aleutian Islands communities west of 170 degrees W. longitude, there are only two civilian communities in that area:  Adak and Atka.

---

[4] Fishermen sell BS and AI Pacific cod to different markets.  The larger AI cod are more valuable.  Paine Decl. ¶ 8; AR3004564; AR 3004573.

AR4015536; AR4015541.  Only Adak has a processing facility that has processed cod from the directed Pacific cod fishery.

### 1.        Adak

Adak, located on Adak Island in the Aleutian Islands chain, is the site of a former military base**.**  AR4001991; AR4015536.  In 2004, the Aleut Corporation acquired the majority of the former military facilities, and has since sought to develop a private sector economy focused on commercial fishing.  *Id*.  Although development of a local residential fishing fleet is a goal of local leadership, the locally-owned CV fleet is tiny, with three residents holding commercial fishing permits as of 2010.  *Id*.  Adak receives a substantial amount of economic benefit from offshore commercial fishing, serving as a port of embarkation and disembarkation for CPs and CVs.  AR4015538.  Vessels use these port visits for crew transfers, purchasing provisions and fuel, offloading product, and purchasing other local goods and services.  *Id*.

Only one shore-based processing plant is located in Adak.  It has the equipment to process large volumes of cod.  When it is operating, the plant takes the majority of its deliveries from vessels from outside the area, including some of the CVs impacted by Amendment 113.  AR4001991.  The Adak shoreplant has had numerous ownership changes and financial difficulties since its establishment in 1999.  AR4015537.  After a decade of multiple ownership changes, the plant filed for Chapter 11 bankruptcy in September 2009.  *Id*.  During the 2010 and 2011 fishing years, financial difficulties surrounding the shoreplant resulted in no processing of cod at the plant.  *Id.*  In 2012, the shoreplant, operated by Icicle Seafood, was open and processed a large amount of cod.  In April 2013, Icicle closed its operations.

In June 2013, the City of Adak purchased the processing equipment from the plant at auction with a goal of finding an operator to reopen the facility.  AR4015537.  In September 2013, Adak Cod Cooperative signed a lease to operate the processing facility and renovated it into a fillet operation.  *Id.*  The renovated shoreplant began processing AI Pacific cod in early February 2014, using six trawl CVs.  AR4015537-4015538.  Four months later, in May 2014, the

Adak Cod Cooperative closed its operation at the Adak shoreplant.  AR4015538.  Since those four months of operation, no cod has been processed at the facility, including during the 2017 fishing year.  *Id.*; Decl. of L. Lockett, ECF No. 25-3, ¶¶ 6, 22.

In the years when it was operating, the Adak shoreplant processed a substantial amount of AI cod.  From 2003-2008, Adak processed 28% of AI cod on average; from 2008-2014, it processed 38% of the harvest on average.  AR3004572 (derived from Table 2-26 at AR3004631).  When the plant was open in 2013 and 2014, it processed 49% and 45% respectively of the cod from the federal AI fishery.  AR3004851.  During 2013 and 2014, Adak processed over twice as much AI cod as the offshore sector when cod from the state GHL fishery is included.  AR3004844; AR3004851.  The Adak shoreplant takes the vast majority of its deliveries from trawl CVs.  81 Fed. Reg. 50444, 50445 (Aug. 1, 2016).  The trawl CV sector has generally increased its share of the AI cod harvest since 2006.  AR4015548.

### 2.       Atka

Atka is located on Atka Island, about 100 miles east of Adak.  AR4015541.  The island has been occupied for over 2,000 years by the Aleut people, and currently has approximately 61 residents.  *Id.*  Atka's economy is predominantly based on subsistence living, as well as commercial halibut and sablefish fishing.  *Id.*  Four Atka residents hold commercial fishing permits for species other than cod.  *Id.*  NMFS has consistently found that Atka has no dependency on the AI cod fishery.  AR4015541-42; AR4001997; AR2003912; AR4013567.  Atka has never directly participated in the cod fishery through vessel ownership or processing operations at the local shore-based processor.  AR40115541-42; Final Rule at 84435.

Atka's single shoreplant primarily processes halibut and sablefish.  AR4015542.  It does not have the equipment to process cod from the directed Pacific cod fishery. Def.-Intervenors' Proposed Answer, ECF No. 31, ¶43 (admitting the allegations in ¶43 of the Complaint averring that the Atka shoreplant "does not have the equipment to process the harvest from the directed Aleutian Islands Pacific cod fishery.") ; AR4015542; AR4015565.  In 2009, Atka community

56080387

leaders opposed action by the Council that would require onshore processing of cod, because of the lack of onshore processing capacity at Adak, and Atka's relationship with a stationary floating cod processor which paid taxes to Atka.  AR3000629; AR3000970; AR3001041. Representatives also indicated that they were uncertain whether shoreside processing of cod in Atka would be economically viable in the short and long term.  AR3001041.

As late as 2011, Atka shoreplant company representatives viewed Pacific cod as inconsistent with the company's business model because it is a low margin product, requiring high volumes of production to be viable, and had no plans to process cod.  AR3000910.  In subsequent years, although Atka representatives repeatedly told the Council that they intended to install equipment that would allow them to process cod; no such equipment was ever installed. AR4015542; AR3004447; AR6000176 (Oct. 15, 2015 public testimony of Atka representative that "[w]hile significant investments are still needed, the community continues to make strides toward concurrent P. cod and crab expansion."); 81 Fed. Reg. at 50447 ("the Atka shoreplant has not received and processed Aleutian Islands Pacific cod").

**D.    The Council struggled for eight years to find a rationale for Amendment 113.**

The Council began considering potential protections for AI shoreplants in June 2008 due to perceived negative impacts on Adak from additional processing by motherships in the eastern and central AI during the 2008 cod season.  AR3000617; AR3004623 ("The impetus for the proposed action originated with shoreside processor and community representatives from Adak, and that concern that increased entry by processing vessels . . . would erode the historical shoreside processing share of the AI Pacific cod.").  The Council initially tasked staff with preparing a discussion paper analyzing the potential establishment of processing sideboards on processing vessels eligible under the AFA, Amendment 80 and 2005 BSAI crab rationalization programs which received delivery of cod in the eastern and central Aleutian Islands. AR4015496-97.  "The impetus for that proposed action was to ensure that the historical share of Pacific cod harvested by CVs and delivered primarily to the Adak shoreplant would continue."

11

AR4015497.  The Council's draft problem statement asserted that the AFA, Amendment 80 and

BSAI crab rationalization programs had "afforded opportunities for consolidation, thus freeing

some processing capacity to target the non-rationalized BSAI Pacific cod fishery at the expense

of other industry and community investments."  AR3000614.  Proponents of the proposed action

contended that lack of sideboards on AI cod processing preempted a significant opportunity for

vessels operating out of Adak and delivering to the Adak shoreplant.  AR3000617.

The Council reviewed two discussion papers, one at its December 2008 meeting and the

other in February 2009, which analyzed the potential ramifications of establishing a processing

sideboard for AI cod.  AR4015497; AR3000415; AR3000610.  In January 2009, Robert Mecum,

the Acting Administrator of the NMFS Alaska Region, wrote to Eric Olson, the Chairman of the

Council, to caution against taking any actions on sideboards that would violate the MSA's

prohibition against the allocation of "excessive shares" of fishing privileges and advised that the

Council would have to articulate a conservation purpose for any such action.  AR3000534-37.

Additional flags were raised in the February 2009 discussion paper.  AR3000664-65.  The

discussion paper cautioned that the proposed action might not provide the intended economic

benefits to AI shoreside processors since it did not direct processing to any particular processor.

AR3000664.  The analysis also warned that the proposed sideboard created the potential for

stranding fish in the Aleutian Islands in the event that other non-rationalized floating processors

were not available, the Adak plant was not operating and/or the Atka plant continued to be

unable to process cod.  AR3000661.

The Council postponed review of the sideboard action until early 2011, when it hoped to

better understand potential restrictions on the fishery to protect endangered Steller sea lions.

AR4015497.  Although a further analysis was prepared for the February 2011 Council meeting,

it was not reviewed by the Council and action was postponed again.  AR3001520.  The

supplemental analysis noted that the "impetus for the proposed action is to ensure that the

historical share of Pacific cod delivered shoreside, primarily to Adak, would continue" but the

closure of the Adak plant in 2010 "significantly affected the distribution of landings to shoreside plants and rationalized processing vessels." AR3000898; AR3000902.

In April 2013, the Council moved away from the sideboard concept and requested an updated analysis of shoreside processing protections focusing on a potential allocation of cod to CVs with a regional delivery requirement to AI shoreplants. AR4015497; AR3001448. The Council member from Alaska making the motion noted that "the amount of cod available is not enough to meet the needs of every sector." AR3001448. At its October 2013 meeting, the Council reviewed the revised discussion paper and postposed further action until February 2014. AR4015497. The Council recognized that action on the proposal would be difficult, due to uncertainty surrounding the potential TAC split between the AI and BS; proposed changes to Steller sea lion mitigation measures; and a state proposal to increase the size of the state GHL fishery. AR4015497.

At its February 2014 meeting, the Council revised its problem statement to assert that the rationalization programs allowed for "increased participation in the non-rationalized BSAI Pacific cod fishery in the Aleutian Islands, thus diminishing the historical share of other industry participants and communities that depend on shorebased processing in the region." AR3004098. The Council voted to initiate analysis of potential regional delivery requirements. AR4015498; AR4015500. In contrast, in his January 29, 2014 briefing memorandum for NMFS Assistant Administrator Eileen Sobeck in advance of the February 2014 Council meeting, Alaska Region Administrator James Balsiger recommended that no further action be taken on the proposed harvest set-aside. AR2006077-78. Dr. Balsiger explained:

> Based on information in the paper [prepared by Council staff], shoreside processing operations have not been adversely affected by offshore processing activities relative to their historical share of processing in the AI. The paper does not indicate that substantial increases in offshore processing are likely in the foreseeable future.

AR2006078.

During the October 2014 Council meeting, the Council's Scientific and Statistical Committee ("SSC")[5] advised that Council staff's analysis of the potential regional delivery requirement relied upon several unsupported but critical assumptions.  AR3004375-77.  The SSC noted that the analysis assumed that the Adak shoreplant would be "consistently operational, sustainable and economically viable," noting that the historical data for the facility "does not provide empirical evidence that this is a foregone outcome."  AR3004375.  The analysis also assumed that deliveries of cod would be of sufficient quantity, quality, and duration for efficient use by Adak, but "[n]o empirical evidence is provided that would corroborate these expectations."  AR3004375.  The analysis also assumed that there would be available, economically viable and sustainable shoreside processing capacity at Atka capable of processing commercial quantities of CV AI Pacific cod.  "As the draft reveals, historically, the Atka facility has not processed commercially significant quantities of Pacific cod."  *Id.*  The SSC observed that anecdotal information indicated that Atka planned to invest in Atka Pacific cod processing capacity, "but details are elusive."  AR3004375.  Finally, the SSC listed several unsupported assumptions embedded in the larger unsupported assumption that CVs would change their behavior and deliver to shoreside processors.  AR3004376.  Nevertheless, after a motion to table the action indefinitely failed, a majority of the Council voted to revise the alternatives under consideration and requested another review draft by Council staff.  AR3004263-64; AR3004403.  The Council members from Washington opposing the motion noted that "it is difficult to operate in Adak because of weather, cost, regulations, etc." and "additional investment in an uncertain fishery is not something the Council should be encouraging."  AR3004263-64.

At the February 2015 meeting, the Council voted to release the draft of an Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis ("EA/RIR/IRFA") for public review.  AR3004555.  Notably, the Council's problem statement no longer focused on

---

[5] The SSC, created by the MSA, is composed of scientists in biology, economics, statistics, and social science. The SSC advises the Council on scientific and other technical matters, including the development of FMPs and management measures.  16 U.S.C. § 1852(g).

an alleged diminishment of historic shares due to rationalization programs, but was amended to state that rationalization programs increased "the risk" that the historical share of BSAI cod of other industry participants and associated communities "may be diminished."  AR3004563.[6] The Council added a sentence finding that:  "The BS/AI cod TAC split and relatively low Pacific cod stock abundance in the Aleutian Islands further increase the need for community protections."  AR3004563, AR3004564.  The problem statement continued to focus on "risk" throughout final agency and Council action.  *See, e.g.*, AR4001938, AR400070, AR4015483.

The Public Review Draft of EA/RIR/IRFA highlighted the speculative nature of the effects of the proposed action.  AR3004623.  The draft observed:

> Implicit in the statement of increased economic activity for AI communities from a directed fishing allocation to CV with a regionalized delivery requirement is the assumption that Pacific cod processing is economically viable at these shorebased processing facilities. However, this assumption may not hold. Processing margins at Adak may be smaller than elsewhere, given its remote location; at least one operation went bankrupt trying to operate in Adak. Another company that operated the Adak processing facility for only two years cited concerns about the health of the region's Pacific cod resource and increased regulatory uncertainty. Most recently, the Adak Cod Cooperative, which started in 2014, has pulled out of Adak only after 4 months of operation. In addition, the processing margins maybe insufficient to support two shorebased processing facilities in the AI during periods of low AI Pacific cod TAC.

AR3004638.  Moreover, any community benefits to Adak from increased processing would likely be offset by a decrease in CP port visits.  AR3004638.  If Atka became operational, the Adak and Atka plants would be competing with each other and would contribute to increased business difficulties for both plants during periods of low DFA.  AR3004639.  In contrast, offshore processors would experience a reciprocal decline in economic activity from loss of cod harvest and processing, and CVs could experience lower prices for their catch with only one plant for delivery.  AR3004639-40.  Overall, the draft concluded, as did all future versions of the analysis, that this action is "likely to have a limited effect on net benefits to the Nation.  In large

---

[6] Although the document in the AR index is referred to as 3004563, the actual AR number at the bottom of the page is 3004555.  This inconsistency should be noted in all instances where AR 3004563 is cited.

part, the action affects distributional equity among various sectors eligible to harvest and process

AI Pacific cod."  AR3004647.  There would be "some economic inefficiency" introduced into

the fishery "which could result in some reduced net benefits to the nation."  AR3004648.

In his September 30, 2015 briefing memorandum for Ms. Sobeck in advance of the

October 2015 Council meeting, Dr. Balsiger again did not support further action on the proposed

harvest set-aside.  AR2006061-62.  He continued to point to the lack of harm or risk of harm to

shoreplants from rationalization:

> Based on information in the analysis, shoreside processing operations have not
> been adversely affected by offshore processing activities relative to their historical
> share of processing in the AI.  The analysis does not indicate that substantial
> increases in offshore processing are likely in the foreseeable future.  Also, there is
> likely to be little or no processing capacity currently in the region because the
> Adak plant is unlikely to be operational in the foreseeable future.

AR2006062.

Nevertheless, the Council took final action at its October 2015 meeting to establish the

harvest set-aside for AI shoreplants, which was ultimately memorialized in Amendment 113 to

the BSAI Groundfish FMP ("Amendment 113"), and the associated final rule. AR4015498.  All

of the Alaska members of the Council voted in favor of the final proposal while three

Washington and Oregon representatives voted against it.  AR3004881.  Dr. Balsiger voted in

favor of the final proposal, despite his recommendation to Ms. Sobeck that no further action be

taken on the issue.  AR6000176.  The Council's stated rationale noted changes to the status quo

since 2008, including Amendment 80, changes to sea lion protection measures, and low TAC

levels:

> At the same time, the Adak shoreplant, a major processor in the AI Pacific cod
> fishery, has struggled to maintain a consistent level of processing due in part to
> these changes and insufficient protections in existing [limited access privilege
> programs ("LAPPs")] that allow an influx of excess processing capacity in the AI
> Pacific cod fishery. These circumstances have exacerbated the need for Council
> action to maintain shore-based processing activity, and as indicated in the
> problem statement. Without Council action, there is a continued risk that
> shoreplants in the AI region will not be able to sustain participation in the AI

Pacific cod fishery. This Council recommendation is critical to maintaining shore-based processing in remote fishing communities of the AI.

AR4015502.  The Council's action would provide an opportunity to maintain shore-based processing, and, according to the Council, "strikes a balance between providing community protections and ensuring that the harvest sectors have a meaningful opportunity to fully harvest Pacific cod by establishing multiple thresholds to prevent AI Pacific cod from being unharvested." *Id.*

NMFS published the proposed rule on August 1, 2016.  81 Fed. Reg. 50444 (Aug. 1, 2016).  The Secretary of Commerce approved Amendment 113 on October 17, 2016.  81 Fed. Reg. 84434, 84435 (Nov. 23, 2016).  NMFS published the Final Rule on November 23, 2016.  81 Fed. Reg. 84434 (Nov. 23, 2016).

**E.     Amendment 113 restricts offshore fishing and processing for the benefit of one onshore processor.**

Amendment 113 and the Final Rule modify the BSAI cod fishery to set aside a portion of the AI cod TAC for harvest by vessels directed fishing for AI cod and delivering their catch for processing to Aleutian Islands shoreplants.  Final Rule at 84434.  Because only the Adak processing plant has cod equipment and Atka's plant has never processed cod, Amendment 113 and the Final Rule effectively require delivery to Adak.  The Final Rule establishes regulations that:

1.  Define the term "Aleutian Islands shoreplants" as processors located on land west of 170 W. longitude in the Aleutian Islands;

2.  Calculate the amounts of the AI cod TAC that is available as a directed fishing allowance ("DFA") that may be targeted by vessels and as incidental catch ("ICA");

3.  Limit the amount of cod that can be harvested by trawl CVs prior to March 21 in the Bering Sea in order to reserve it for harvest in the AI;

4.  Set aside some or all of the AI cod DFA from January 1 to March 1 for harvest by vessels directed fishing for AI cod that deliver to AI shoreplants.  If the DFA is less

than 5000 metric tons ("mt"), only vessels delivering to AI shoreplants may fish and offshore processing is prohibited;

5. Require that either the City of Adak or Atka annually provide notification to NMFS prior to November 1 of an intent to process cod during the upcoming fishing year in order to trigger the set-aside and Bering Sea catch limitations in the upcoming year; and

6. Remove the restrictions if less than 1,000 mt of the harvest set-aside is landed at AI shoreplants before February 28, or if the set-aside is fully taken before March 15.

Final Rule at 84434-58; AR4015901-02; AR4016073-74.

These actions benefit only the Adak shoreplant—assuming both that it is operating and onshore processing is economically viable.  AR4015564 ("Implicit in the statement of benefits for AI communities is the assumption that processing AI Pacific cod at AI shoreplants is economically viable.").  Prior to final action by the Council, NMFS skirted the issue of actual benefits to Atka, admitting that Atka would not likely be impacted by the set-aside since it had not historically processed cod and has no ability to do so.  *See, e.g.*, AR3004605 ("Atka, the only other AI community, is not as involved with the Pacific cod fishery, so the impacts from the preferred alternative are likely more long term").

Amendment 113 and the Final Rule also harm long-time participants in the fishery such as Plaintiffs.  AR4015566 (vessels "that have historically participated in the offshore AI Pacific cod fishery will likely experience a loss of economic activity from the proposed action.").  The Final Rule shuts out long-time AI cod fishery participants in several ways.  *Id.  First,* motherships can no longer buy cod or process it at sea during the set–aside period.  *Second*, CPs cannot fish for cod or process it at sea during the set-aside period.  A80 CPs cannot access larger and more valuable cod found only in the Aleutian Islands, and cannot make up that loss elsewhere.  CPs have limits on catches of all groundfish species and cannot simply increase their catches in other fisheries.  Multiple operational challenges preclude them from efficiently catching more of their cod allocation in the Bering Sea.  Loomis Decl. ¶ 9(b) (Amendment 80

18

CPs fish for Atka mackerel, a fishery that takes place only in the Aleutian Islands, limiting their ability to move between the two areas); Hyde Decl. ¶4(f); AR4015562; AR300330 (trawl CPs constrained by higher rates of prohibited species in the BS).

*Third*, certain CVs cannot participate in the AI fishery during the set aside because they do not have refrigerated equipment that allows them to deliver to shore. AR4002021. *Fourth,* with reduced competition among shore-side processors due to only a single Amendment 113 shoreplant, CVs may be unable to obtain a high enough price for their catch to make it economical to participate. If the Adak shoreplant is operational and offering a fair price for fish, vessels that deliver to it would benefit, while those that do not will lose revenue and their historical opportunity to participate in the fishery. AR4015560-61. *Fifth,* CVs displaced from the AI cod fishery have limited opportunities for redeployment into other North Pacific groundfish fisheries because they are subject to sideboards limiting their catch of other species. AR4015521; AR4015563. The effect of the Bering Sea catch limitation will be a redistribution of cod from trawl CVs operating in the Bering Sea to those operating in the Aleutian Islands. AR4015558. If vessels that traditionally fish in the Aleutian Islands shift their effort to the Bering Sea during the harvest set-aside, it will be at the expense of other vessels' ability to harvest cod in the Bering Sea. AR4015562.

It is highly unlikely that displaced offshore participants will make up their lost catch after March 15 of each year. AR4015568. Vessels fishing in the Bering Sea are unable to move quickly to the Aleutians before the quality of cod deteriorates at the end of March. Offshore processors are also unlikely to find a buyer for their cod late in the fishery's season. AR4015568; AR4002000. During years of low TAC, "there will likely be little opportunity for these sectors to participate in the AI Pacific cod fishery after the removal of the harvest set-aside, all else equal." AR4015568.

# IV.      ARGUMENT

## A.      Standing

Plaintiffs have brought their claims under the APA, which requires a plaintiff to satisfy both constitutional and prudential standing.  *Bennett v. Spear*, 520 U.S. 154, 162-163 (1997). Plaintiffs satisfy both standing requirements.

### 1.      Constitutional standing

Constitutional standing derives from the requirement that federal courts can act only upon a justiciable case or controversy.  U.S. Const. Art. III.  To meet the case or controversy requirement, a plaintiff must satisfy three elements:  (1) injury-in-fact, (2) a causal connection such that the injury is "fairly traceable" to the defendant's action, and (3) a "likelihood" that the injury will be redressed by a favorable decision.  *Bennett v. Spear*, 520 U.S. at 162; *see also Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 732-733 (D.C. Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61(1992)).

Amendment 113 will harm Plaintiffs in a number of ways.  Among other things, the Final Rule adversely impacts certain vessels' ability to participate in the Aleutian Islands Pacific cod fishery, including vessels that are uniquely dependent on the fishery.  Decl. of M. Hyde ("Hyde Decl."), ¶ 4(d)-(e).  Plaintiffs will no longer be able to operate vessels with modifications that make them uniquely suited to the fishery.  Downing Decl. ¶ 8(a).  The anticompetitive conditions created by Amendment 113 also interfere with competitive pricing.  Paine Decl. ¶ 10(a).

In addition, Amendment 113 has adverse impacts on the conduct of BSAI cod fisheries. It creates a race for fish in the eastern Bering Sea, shortening the Pacific cod fishing season. Paine Decl. ¶ 10(b); Downing Decl. ¶ 8(b).  It increases the likelihood that prohibited species catch ("PSC") limits will be exceeded and the Pacific cod fishery will be closed prematurely. Paine Decl. ¶ 10(c), Hyde Decl. ¶ 4(g), Downing Decl. ¶ 8(c), Loomis Decl. ¶ 9(a).  These conditions inhibit Plaintiffs' ability to find alternative fishing grounds.  Paine Decl. ¶ 10(d), Hyde Decl. ¶4(f), Downing Decl. ¶ 8(d), Loomis Decl. ¶ 9(c).

56080387

Amendment 113 has also had immediate impacts on Plaintiffs' financial strength and planning abilities, due to the operational challenges and uncertainties that are associated with Amendment 113.  Paine Decl. ¶ 11, Hyde Decl. ¶5, Downing Decl. ¶ 9, Loomis Decl. ¶ 10. Plaintiffs do not know where, when, and how their vessels will operate and fish in future years, which impacts the economic viability of their companies and their vessels.  *Id; see also, e.g., Clinton v. City of New York*, 524 U.S. 417 (1998) (recognizing that contingent liability is sufficient to confer Article III standing); *Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1301 (10th Cir. 2008) ("this potential liability has a present impact on its business—that is, the contingent liability has created an actual and imminent injury").  These harms are sufficient to satisfy the injury-in-fact requirement of constitutional standing.

These harms can be directly attributed to Amendment 113.  For example, Amendment 113 will directly cause vessels to be displaced to the Bering Sea because those vessels cannot catch and process fish in the Aleutian Islands under Amendment 113.  Hyde Decl. ¶ 4(f)-(g); Loomis Decl. ¶ 9(a).  Amendment 113 results in reduced competition among shore-side processors, increased bycatch, and lost fishing opportunities.  *E.g.,* Loomis Decl. ¶ 9(b), Hyde Decl. ¶ 4(d)-(e), Downing Decl. ¶ 8(a).  Even in years when the Amendment 113 set-aside is not in place, Plaintiffs will suffer financial instability due to continuing operational uncertainties. Paine Decl. ¶ 10(d), Hyde Decl. ¶4(f), Downing Decl. ¶ 8(d), Loomis Decl. ¶ 9(c).

Finally, Plaintiffs' harms will be redressed by a favorable decision from this Court.  As described above, Amendment 113 has restricted Plaintiffs' ability to participate in the Aleutian Islands Pacific cod fishery, including vessels that are uniquely dependent on the fishery, Hyde Decl., ¶4(d)-(e), and vessels with modifications that make them uniquely suited to the fishery, Decl. of J. Downing, ¶ 8(a).  A judgment in favor of Plaintiffs would restore fishing practices to *status quo ante*, allowing these vessels to fish consistent with their historic practices and allocations, and ensuring that the fishery remains economically viable.

### 2. Prudential standing

Prudential standing requires that a party's grievance arguably fall within the zone of interests protected or regulated by the statutory provision invoked in the suit. *Bennett v. Spear,* 520 U.S. at 162; *see also Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970) (holding that the relevant inquiry is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question"). Trade associations such as Groundfish Forum and United Catcher Boats have standing to challenge federal actions affecting their members' economic interests if such interests are within the "zone of interests" contemplated by a particular statute. *National Coal Association v. Hodel,* 825 F.2d 523, 529-30 (D.C. Cir. 1987) (citing *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399 (1987) and noting that the test was "not meant to be especially demanding").

The legality of Amendment 113, an amendment to the BSAI Groundfish FMP, is squarely within the zone of interests to be protected by the MSA. As one court explained: "The MSA … promotes commercial fishing, subject to conservation and management measures, and recognizes that '[c]ommercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation.' 16 U.S.C. § 1801(a)(3)… The MSA provides the federal government authority to regulate not only the harvesting of fish, but also, to a certain extent, their possession and sale. *See* 16 U.S.C. § 1853(b)(3)." *Chinatown Neighborhood Ass'n v. Harris*, 33 F.Supp.3d 1085, 1102 (N.D. Cal. 2014) *aff'd sub nom. Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136 (9th Cir. 2015), *cert. denied*, 136 S.Ct. 2448 (2016). Here, the unlawful imposition of Amendment 113 on Plaintiffs implicates the type of action that is regulated by, and therefore within the zone of interest of, the MSA.

### B. Standard of Review

The MSA provides for judicial review pursuant to the APA. 16 U.S.C. §1855(f)(1). Under the APA, an agency action is set aside if it exceeds statutory authority, or is arbitrary,

capricious, or otherwise not in accordance with law.  5 U.S.C. §706(2)(A), (C).  An action is

arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Int'l Ladies'*

*Garment Workers' Union v. Donovan*, 722 F.2d 795, 814 (D.C. Cir. 1983) (*quoting Motor*

*Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).  In

making this determination, the court considers "whether the agency acted within the scope of its

legal authority, whether the agency has explained its decision, whether the facts on which the

agency purports to have relied have some basis in the record, and whether the agency considered

the relevant factors." *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 93 (D.D.C.

2006) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995))

　　　　While agency actions are granted deference, *Baltimore Gas & Elec. Co. v. NRDC*, 462

U.S. 87 (1983), they are not spared a "thorough, probing, in-depth review." *Citizens to Preserve*

*Overton Park v. Volpe,* 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v.*

*Sanders*, 430 U.S. 99 (1977).  Further, deference is not due when the agency's decision is

without a substantial basis in fact.  *Fed. Power Comm'n v. Florida Power & Light Co.,* 404 U.S.

453, 463 (1972).  Thus, the APA requires that "the agency must examine the relevant data and

articulate a satisfactory explanation for its action including 'a rational connection between the

facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43 (*quoting*

*Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).  "The reviewing court

should not attempt itself to make up for [an agency's] deficiencies:  'We may not supply a

reasoned basis for the agency's action that the agency itself has not given.'"  *Id.* (*quoting SEC v.*

*Chenery Corp.,* 332 U.S. 194, 196 (1947)).  "Summary judgment thus serves as the mechanism

for deciding, as a matter of law, whether the agency action is supported by the administrative

record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella,* 459

F. Supp. 2d 76, 90 (D.D.C. 2006)

**C.      Amendment 113 is an unlawful onshore processing privilege.**

Agencies may only take regulatory actions that are within the scope of the authority granted to them by Congress. *Portland General Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1026 (9th Cir. 2007) ("an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000)); *Wyoming v. Dept. of Interior*, No. 2:15-CV-043-SWS, Case No. 2:15-CV-041-SWS, 2016 WL 3509415, at *12 (D. Wyo. June 21, 2016), appeal docketed (10th Cir. June 29, 2016) (*citing Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119-20 (D.C. Cir. 1995)) ("In the absence of a statute conferring authority, then, an administrative agency has none."). The creation of an exclusive processing period and set-aside for AI shoreplants is unlawful and invalid because it exceeds the agency's authority under the MSA, which is limited to regulating at-sea activities.

**1.      Onshore processing privileges are unlawful.**

NMFS' regulatory authority ends at the beach. The plain text of the MSA makes it clear that NMFS' regulation of "fishing" does not extend to onshore processors. The statutory definition of "fishing" is: "(A) the catching, taking, or harvesting of fish; (B) the attempted catching, taking, or harvesting of fish; (C) any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish; or (D) any operations at sea in support of, or in preparation for, any activity described in subparagraphs (A) through (C)." 16 U.S.C. § 1802(15). Subsection (D) sets forth which processors are to be regulated by NMFS under the MSA—such regulation only extends to processors "at sea." "[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (internal quotation marks omitted). The MSA does not authorize NMFS to allocate processing privileges to onshore processors. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the

administrative structure that Congress enacted into law.'") (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)).

Although this unambiguous language makes it unnecessary to examine the agency's interpretation of the statute, NMFS itself has recognized that onshore processing privileges are unlawful.  In a memorandum dated September 30, 2009 ("Lindeman Memorandum"), NOAA General Counsel Lisa L. Lindeman responded to inquiries from the NPFMC regarding the legality of shored-based processing privileges.  AR5000068-78.  In the Lindeman Memorandum, the NOAA General Counsel concluded:  "The [MSA] does not authorize the Council or the Secretary of Commerce (Secretary) to allocate shore-based processing privileges.  This conclusion was based on the [MSA's] definition of fishing, which was found to not include shore-based processing."  AR5000070.  Ms. Lindeman explained that this legal conclusion, which dates back to 1993, still existed in 2009 and fully takes into account the reauthorization of the MSA, which occurred in 2006.  AR5000070-71 ("As recently as October 30, 2007, [NOAA Counsel] stated that the [MSA] did not authorize the allocation of shore-based processing privileges."); AR5000071  ("Nothing has occurred since the 2007 letter to change the NOAA Office of the General Counsel's opinion that the [MSA]… does not authorize the creation or allocation of shore-based processing privileges.").

### 2.    Harvesting privileges to onshore processors can be lawful.

The Lindeman Memorandum also concludes that harvesting privileges to onshore processors can be lawful under the MSA.  Relying on a 1993 legal opinion, Ms. Lindeman explained that "harvest privileges can be issued to persons other than harvesters if such allocations are consistent with national standard 4 and other applicable law."  AR5000072-73. This understanding was confirmed in 2005, when NOAA's Northwest Regional Counsel stated that "allowing IFQ (harvest privileges) to be issued to, or held by, fish processors" would be acceptable if there was a "record developed to support it."  AR5000073.  Thus, the Lindeman Memorandum concludes that "the [MSA] authorizes the allocation of harvest privileges to shore-

based processors if other requirements of the Act are met, e.g., eligibility requirements for

limited access privileges found at sec. 303A(c)(1)(D), allocation requirements of national

standard 4 found at sec. 301(a)(4), allocation requirements for limited access privilege programs

found at sec. 303A(c)(5), and other applicable provisions." *Id.*

### 3. Amendment 113 is not a lawful harvest privilege, and is instead an unlawful onshore processing privilege.

Although styled as a "harvest set-aside," Amendment 113 creates an exclusive grant of

authority to process AI Pacific cod up to a certain amount of fish during a certain period of the

year. That is, Amendment 113 does not authorize Aleutian Islands shoreplants to "harvest" fish.

Rather, by its plain terms, Amendment 113 sets aside an amount equal to the lesser of either the

Aleutian Islands DFA or 5,000 metric tons to be processed by Aleutian Island shoreplants and

prohibits offshore processors from processing that amount in the key period of the fishery. Final

Rule at 84457; *see also id.* at 84457 (requiring the City of Adak or the City of Atka to file

official notifications of "intent to *process* Aleutian Islands pacific cod.") (emphasis added). The

history of Amendment 113 confirms that it was intended as an onshore processing privilege.

AR3000898 (the "impetus for the proposed action is to ensure that the historical share of Pacific

cod delivered shoreside, primarily to Adak, would continue"); *see also* AR4015497;

AR3000614; AR2006078; AR4001929. As such, Amendment 113 is an onshore processing

privilege, and is therefore unlawful.

Even if Amendment 113 could somehow be considered a harvest privilege, it is not a

*lawful* harvest privilege that comports with the requirements of the MSA. The Lindeman

Memorandum specifically states that a harvest privilege to a shoreside processor will only be

considered lawful "if other requirements of the Act are met," including lengthy and detailed

LAPP eligibility and allocation requirements and National Standard 4's allocation requirements.

AR5000073. Federal Defendants failed to comply with these requirements. For example,

NMFS cannot allocate harvest privileges to a fishing community (which, as defined by 16 U.S.C.

§ 1802(17), may include processors) unless the community demonstrates that it is eligible to

26

participate in a LAPP.  16 U.S.C. § 1853a(c)(3).  Here, NMFS did not comply with the statutory

procedures for creation of a LAPP in the development of Amendment 113.  *See* 16 U.S.C.

§ 1853a(c)(1).  Nor did it demonstrate that Adak and Atka and their shoreplants are eligible to

participate in a LAPP.  *See* 16 U.S.C. § 1853a(c)(3).  Moreover, as described in detail below,

NMFS failed to comply with National Standard 4 when promulgating Amendment 113.  Thus,

Amendment 113 is not a lawful harvest privilege because it fails to comply with statutory

requirements relating to LAPPs and otherwise violates the MSA.  In sum, regardless of how

Amendment 113 is characterized (an unlawful onshore processing privilege or an unlawful

harvest privilege), NMFS's adoption of Amendment 113 was "not in accordance with law" in

violation of the APA.  5 U.S.C. §706(2)(A).

**D.      By relying on critical assumptions not supported by substantial evidence, NMFS has not articulated a rational basis for Amendment 113.**

NMFS has not articulated a rational basis for its decision to adopt Amendment 113, and

cannot point to a substantial basis in fact that supports its rationale for the action.  NMFS and the

Council stated that the purpose of the action is "to provide stability to AI shoreplant operations

and the communities dependent on shoreside processing activity."  AR4001929 (Nov. 2015

RIR/EA/IRIR); AR400063 (Feb. 2016 RIR/EA/IRIR ).[7]  Here, the record before the agency does

not demonstrate that offshore processing is the cause of instability in AI shoreplants, or that

Amendment 113 will provide reliable benefits to either Atka or Adak.  The Council and NMFS

relied on selective data about historical participation, ignored repeated warnings that the

proposed action was based on unsupported assumptions about the viability of shore-based

processing in the Aleutian Islands, and disregarded the speculative nature of the potential

benefits to Adak and Atka.  NMFS therefore acted arbitrarily and capriciously in adopting

---

[7]In the June 2016 Secretarial Review Draft of the RIR/EA/IRIR, the statement of intent honed in on certain participants in the cod fishery but excluded those dependent on offshore processing: "The intent of this action is to provide stability to AI harvesters, AI shoreplant operations, and AI fishing communities dependent on AI Pacific cod harvesting and shoreside processing activity." AR4015476.  Amendment 113 will not stabilize onshore processors or the communities in which they are located, and destabilizes the offshore harvesting sector.

Amendment 113 in violation of the APA.  *See American Tunaboat Ass'n v. Baldridge*, 738 F.2d

1013, 1016 (9th Cir. 1984) (holding it was arbitrary and capricious for NOAA to ignore relevant

data for speculative reasons; "the basic assumption underlying the NOAA calculation was not

supported by substantial evidence.").

*First*, it is undisputed that the Atka shoreplant has never processed cod from the AI

directed fishery and has no historical share of the AI cod fishery.  It has never served as a

significant resupply port for the offshore cod fishery.  AR3000910; AR4015489.  Therefore it

cannot have been adversely affected by rationalization programs or other management changes

in the AI cod fishery.  With no history of cod processing, the Atka community cannot be

"dependent" on the cod fishery.  AR4013567 (agency analyst questioning whether the two

communities "depend" on their shoreplants, given Adak's inconsistent operating history and the

fact that Atka "hasn't taken 'commercial-scale' deliveries of P.cod (or anything but halibut . . .

and some sablefish)").

With no equipment that allows it to process large amounts of cod at the shoreplant, Atka

will not benefit from Amendment 113, and the failure to install such equipment over the eight

year history that the Council considered the action demonstrates not only that the Council

ignored relevant historical data, but that any future benefits to Atka are speculative at best.  The

agency's statement of belief that equipment may be installed at some future date is not sufficient

to support regulatory action.  AR4000191 (Despite uncertainty, "it is believed" Atka will have

the ability to receive CV cod deliveries "within the timeframe of this action.").  Moreover, if

Atka ever installs cod equipment, it will be in direct competition with Adak's shoreplant for the

same set-aside amount, which the agency admits is not large enough to benefit two operating

plants.  AR4002020-21 ("The increased competition for AI Pacific cod deliveries between AI

shoreplants could contribute to increased business difficulties for the AI shoreplants during years

of low AI Pacific cod set-asides.").

*Second,* the administrative record does not support the agency's assumption that an

increase in offshore processing capacity since 2007 is the cause of instability in Aleutian Islands

onshore processing.  81 Fed. Reg. at 50450.  Before final action by the Council on Amendment

113, Federal Defendants repeatedly concluded that rationalization programs were not harming AI

onshore processors.  For example, in promulgating Amendment 80, NMFS explicitly considered

potential harm to onshore processors and concluded that there would be none.  Mothership

processing by Amendment 80 CPs was prohibited by the draft rule for Amendment 80, but

NMFS reconsidered in light of public comment and revised the final rule to allow it.

AR3000533; AR400035-36 ("Thus, the proposed and final rules for Amendment 80 clearly

anticipated and analyzed this issue, and concluded that future potential impacts on the non-

Amendment 80 sectors and onshore processing sectors were not likely to be substantial.").

Likewise, during the development of Amendment 113, agency analysts and management

repeatedly concluded that AI onshore processing was not harmed by rationalization programs.

*See* AR2006077-78; AR2006061-62 ("Based on information in the analysis, shoreside

processing operations have not been adversely affected by offshore processing activities relative

to their historical share of processing in the AI.  The analysis does not indicate that substantial

increases in offshore processing are likely in the foreseeable future.").

        In fact, in the years when the Adak plant was operating, it received a substantial amount

of Pacific cod to process, as demonstrated by Table A below,[8] but still was unable to sustain

operations over the long term.

TABLE A

| CVs delivering AI Pacific cod to CPs and Floaters | | | | | Adak and Atka Shoreside Processing | | | |
| Year | # CVs | # CPs & Floaters | MT | | Year | Federal MT | GHL MT | Total MT |
| 2003 | 18 | 3 | 8,209 | | 2003 | 8,716 | - | 8,716 |
| 2004 | 12 | 4 | 4,153 | | 2004 | 9,282 | - | 9,282 |
| 2005 | 9 | 3 | 1,521 | | 2005 | 6,440 | - | 6,440 |
| 2006 | 11 | 4 | 2,355 | | 2006 | 4,763 | 926 | 5,689 |
| 2007 | 13 | 5 | 3,206 | | 2007 | 10,000 | 2,586 | 12,586 |
| 2008 | 21 | 6 | 9,621 | | 2005 | 4,679 | 1,315 | 5,997 |
| 2009 | 13 | 5 | 6,732 | | 2009 | 8,268 | 351 | 8,619 |
| 2010 | 23 | 5 | 12,443 | | 2010 | 177 | 30 | 207 |
| 2011 | 14 | 4 | 7,726 | | 2011 | 39 | 14 | 53 |
| 2012 | 13 | 4 | 3,056 | | 2012 | 3,166 | 4,317 | 7,483 |
| 2013 | 9 | 3 | 1,587 | | 2013 | 3,511 | 4,777 | 8,288 |
| 2014 | 5 | 4 | 1,793 | | 2014 | 2,477 | 4,099 | 6,576 |
| 2015 | 8 | 6 | 2,696 | | 2015 | - | - | - |
| Average | 13 | 4 | 5,008 | | Average | 4,732 | 1,842 | 6,149 |

[8] Table A is derived from Tables 2-32 and 2-31 at AR4015555.  Since Atka has never processed cod, all amounts in Table A should be attributed to Adak.

29

The average share of cod from the federal fishery that the Adak plant received from 2003 to 2015– not even including its share of the state GHL fishery beginning in 2006 – was approximately 4700 mt, only 300 mt below the harvest set aside in Amendment 113.  *See* Table A, *supra*.  AR4015490.  In the two years before the Adak plant closed in 2015, it processed 49% and 45% respectively of the cod from the federal AI fishery, more than its long term average. AR3004851; AR2004525.  In contrast, during the period from 2003 to 2015, CPs acting as motherships and floating processors averaged 5000 mt, declining from over 15,000 mt per year prior to 2008.  *See* Table A, *supra*.  Since a peak in 2007, the number of trawl CPs and their catch and first wholesale gross revenue has been in decline.  AR4001978.  Since 2012, the amount of cod processed by CPs *decreased*, not increased—except for the years when the Adak plant was closed, when by default the offshore sector processed 100% of AI cod.  AR3004851*; see also* AR4001940*.*

The record demonstrates that the business challenges to the Adak plant existed as soon as it opened.  The plant's ownership changes and closures predated rationalization programs such as Amendment 80.  The record shows that it is extremely difficult if not impossible to operate an economically sustainable processing operation in Adak.  "Processing margins at AI shoreplants may be smaller than elsewhere, given their remote location."  AR4002019; *see also* AR3004571 ("A major assumption behind this action is that a year round plant on Adak is a sustainable business, when in fact a number of experienced operators have failed and not because of offshore competition, but more likely due to a variety of factors, including a short cod season and high operating costs.")  There are very few fisheries near Adak with sufficient quantity and value to reduce economic risk from volatile fishery conditions.  AR4002019.  The fundamental problems with Adak's (and Atka's) remote locations, challenging logistics, and lack of access to multiple fisheries will not be removed by Amendment 113.  "[G]iven the past financial difficulty of the Adak shoreplant, it is uncertain whether a shore-based plant will be operational in Adak in the near or long-term future, with or without the proposed action."  AR4000191.

What the record does show is that all participants in the AI cod fishery have been negatively impacted by the fact that fewer fish are available to harvest and process. These reductions stem from a number of factors, including lower TAC levels and the management split of BS and AI stocks. *See* Section III.B, *supra*. Contrary to NMFS' assertions, there was not a sudden influx of new players who snatched cod away from Adak. *See, e,g,* Final Rule at 84435 (The Council determined and NMFS agrees that "the rationalization programs, and particularly the Amendment 80 Program, have allowed an influx of processing capacity into the Aleutian Islands Pacific cod fishery'). In fact, the Adak shoreplant held its own in terms of its share of a reduced overall harvest when it was open. Perhaps recognizing this fact, the Council revised its early problem statements, which asserted that rationalization programs had actually diminished Adak's historical share, to postulate an "increased risk" of diminishment of Adak's share of cod processing. *Compare* AR3004098 with AR4001938 and AR4000070. The record shows that this postulated risk is either nonexistent or decreasing. Federal Defendants' conclusions both as to the effect of rationalization on AI onshore processors and the causes of their instability are not supported by the evidence in the record.

*Third*, the agency's finding that Amendment 113 will result in greater stability for Adak is based on magical thinking, not reasoned conclusions based on the record before it. The assertion that Amendment 113 would result in "substantial community level impacts" from "increased activity from processing of AI Pacific cod" is built on unfounded assumptions, not facts. AR4001943. The agency admits that "[a]sessing the effects of the alternatives and options involves some degree of speculation." AR4015545. The assumption that CVs will change their delivery from motherships to Adak rather than moving to the Bering Sea is unsupported and speculative. AR3004375-76. CVs may choose not to participate in the fishery during the harvest set-aside period if they cannot negotiate a sufficient price for their catch. AR3004414; Paine Decl. ¶ 10(a)-(b). In addition, some CVs that have historically participated in the offshore fishery lack refrigerated seawater holding tanks, preventing them from making the long run to deliver their catch to shore. AR4002021; AR4013482. Most importantly, the agency repeatedly

31

assumed, despite Adak's history to the contrary, that cod processing at AI plants is economically viable.  AR3000913; AR4002019; AR3004463 ("Implicit in the statement of increased economic activity from a directed fishing allowance to CV[s] with a regionalized delivery requirement is the assumption that Pacific cod processing is economically viable at Adak.  However, this assumption may not hold.")  The Adak plant filed for bankruptcy in 2009, even though it processed 8,619 mt of cod that same year.  AR3001015; AR401555 (Table 2-31); *see also* Table A, *supra*.  To postulate that benefits would accrue to Adak from the action, the agency necessarily assumed without reasonable support that the Adak plant will reopen at some point in the future.  The history of the Adak facility "does not provide empirical evidence that this is a foregone outcome."  AR3004375.

Given that the evidence does not support the assumption that there will be sustained operations at Adak, the agency's assumption that there will be a net benefit to Adak from Amendment 113 is also unsupported.  After final action by the Council, the agency speculated that at best, "any increase in economic activity in Adak as a result of increased CV port visits will likely be offset to some degree by a decrease in economic activity in the Adak community from a reduction in CP port visits."  AR4002020.

For all of these reasons, Federal Defendants' assumptions and conclusions as to the reasons for and potential benefits from Amendment 113 are speculative, which is insufficient as a matter of law to support its adoption.  *Arizona Cattlegrowers' Association v. U.S. Fish and Wildlife Service*, 273 F.3d 1229, 1244-1247 (9th Cir. 2001); *American Tunaboat Ass'n v. Baldridge*, 738 F.2d at 1016.

## E.     Amendment 113 violates National Standard 8.

Pursuant to National Standard 8, conservation and management measures must, consistent with the conservation requirements of the MSA, "take into account the importance of fishery resources to fishing communities" using best available data in order to (A) provide for the sustained participation of such communities and (B) to the extent practicable, minimize

adverse economic impacts on such communities.  16 U.S.C. § 1851(a)(8).  However, National

Standard 8 "does not constitute a basis for allocating resources to a specific fishing community

nor for providing preferential treatment based on residence in a fishing community."  50 C.F.R.

§ 600.345(b)(2).  To the extent NMFS takes into account the importance of a fishery resource to

a fishing community, it may only do so after establishing that an action serves a conservation

purpose that is consistent with the MSA.  *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747,

753 (D.C. Cir. 2000) ("The Government concedes, and we agree, that, under the [MSA], the

Service must give priority to conservation measures.  It is only when two different plans achieve

similar conservation measures that the Service takes into consideration adverse economic

consequences.").  Here, Amendment 113 violates National Standard 8 because, without

articulating a conservation purpose that complies with the MSA's conservation directives, NMFS

has allocated resources to a specific fishing community (Adak) and provided for preferential

treatment based on residence in a fishing community.

> 1. **Amendment 113 does not have a conservation purpose.**

"The term 'conservation and management' refers to all of the rules, regulations,

conditions, methods, and other measures (A) which are ***required to rebuild, restore, or***

***maintain… any fishery resource*** and the marine environment."  16 U.S.C. § 1802(5) (emphasis

added).  A "fishery resource" is "any fishery, any stock of fish, any species of fish, and any

habitat of fish."  16 U.S.C. § 1802(15).  Amendment 113 does not impose any new requirement

to rebuild, restore, or maintain the Aleutian Islands Pacific cod fishery.  Rather, NMFS concedes

that the sole basis for the Amendment 113 set-aside is to "provide[] the opportunity for vessels,

Aleutian Islands shoreplants, and the communities where Aleutian Islands shoreplants are

located to receive benefits from a portion of the Aleutian Islands Pacific cod fishery."  Final Rule

at 84434.  The fishery – as that term is defined by the MSA – receives no benefit from

Amendment 113.

In the Final Rule, NMFS asserts that because Amendment 113 does not change existing regulations relating to TACs and other limits, and because "NMFS will continue to manage the fishery so that harvests stay within specified and allocated amounts," Amendment 113 promotes conservation.  Final Rule at 84444.  This logic is flawed.  NMFS essentially asserts that it is enough that prior regulations promoted conservation; Amendment 113 does not need to as well.  Put another way, NMFS' position is that because Amendment 113 did not eclipse the conservation benefits of prior regulatory actions, it has a conservation purpose.  But the MSA requires that all amendments to any FMP, including Amendment 113, be consistent with the National Standards.  16 U.S.C. § 1851(a)(9); 16 U.S.C. § 1853(a)(11).  This means that NMFS must ensure that Amendment 113, in and of itself, complies with the National Standards.  *See, e.g., Flaherty v. Bryson,* 850 F. Supp. 2d 38, 55 (D.D.C. 2012) (the MSA includes "a clear Congressional statutory command ... that NMFS shall review FMP amendments for compliance with all provisions of the MSA."); *Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1046-1048 (N.D. Cal. 2013) (recognizing that all aspects of a fishery management plan are not reopened with every amendment, and that each amendment must comply with the MSA).  NMFS' assertions are therefore contrary to law and should be rejected.

Moreover, Amendment 113 may in fact decrease resource conservation for BSAI groundfish fisheries.  The trawl sectors are required to minimize catch of "prohibited species" (such as halibut and crab), which must be discarded after being recorded by fishery observers.  Loomis Decl. ¶ 9(a).  As a result of Amendment 113, the vessels that are displaced from the Aleutian Islands to the Bering Sea will encounter more of these prohibited species and increase their PSC catch rates.  *Id.*  This increases the likelihood that Amendment 80 groundfish fisheries will hit the PSC limits, and the fisheries will be prematurely closed.  *Id.*  This also disrupts the balance that is intended to be struck by having diverse regional fishing opportunities.[9]  *Id.*  More

---

[9] Amendment 113 also violates National Standard 1 because it will prevent the Pacific cod fishery from achieving optimum yield.  16 U.S.C. § 1851(a)(1).  Not only will Amendment 113 disrupt the balance that is intended to be struck by having diverse regional fishing opportunities, but Amendment 113 will strand fish that would have otherwise been caught and processed at sea.

PSC will be caught in one area, rather than spreading the impact (and risk) of PSC across a wider region.  *Id.*

Not only has NMFS failed to articulate a conservation purpose under the MSA, thereby precluding any consideration of economic impacts, but Amendment 113 may in fact result in adverse impacts to BSAI fishery resources.

### 2.   NMFS violated National Standard 8 by allocating resources to only one fishing community.

The determination of whether an action is consistent with National Standard 8 is a two-step inquiry:  (1) Do two alternatives achieve similar conservation measures?  (2) If so, which alternative minimizes adverse economic consequences?  It is only when two alternatives serve a legitimate conservation purpose that NMFS may consider economic impacts on fishing communities.  *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d at 753; *Blue Ocean Inst. v. Gutierrez*, 585 F.Supp.2d 36, 44 n. 4 (D.D.C. 2008) ("The Department acknowledges that it weighed the adverse economic effects on fishing communities against the proposed closure.  This was error….  Because none of the scenarios that the Department evaluated 'achieved similar conservation measures,' it should not have considered the adverse economic effects on the proposed closure on fishing communities."); *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 91–92 (D.D.C. 2007) ("Explicit in both the statutory text and the implementing regulations is Congress's intent that conservation efforts remain the Secretary's priority, and that a focus on the economic consequences of regulations not subordinate this principal goal of the MSA.  Hence, it is only when two different plans achieve similar conservation measures that the [NMFS] takes into consideration adverse economic consequences.") (internal citations and quotations omitted).

---

AR3000661; AR2003946; AR3004853.  Also, cod that would have been harvested in the Bering Sea will likely not be caught due to Amendment 113's restrictions on the total amount of A season Pacific cod that can be harvested by CVs prior to March 21.  *E.g.,* AR4015562; AR4015521; AR4015563; AR4015568.  On balance, Amendment 113 restricts CV and CPs' ability to harvest, process, and deliver Pacific cod, thereby precluding the fishery from achieving optimum yield in violation of National Standard 1.

Here, Amendment 113 was driven first by economic goals; any articulation by NMFS of a conservation purpose was an afterthought.  *See, e.g.,* AR300130 (analysis of cod split should focus on "efforts to facilitate a viable shore-based processing sector in the Aleutian Islands communities of Adak and perhaps, Atka"); AR3000536 (noting that the Council has failed to articulate a legitimate conservation purpose for Amendment 113); AR4001899 (remarks of Council member N. Kimball:  "most notably at this time it could serve to benefit Adak"); . Indeed, NMFS concedes that the sole purpose of Amendment 113 is to provide increased economic stability for the communities of Adak and Atka.  AR4000163, 4000153; *see also* Final Rule at 84436, 84443.

Amendment 113 further violates National Standard 8 because it allocates fishery resources to a single community—Adak.  There is no evidence to suggest that Atka is prepared to process Aleutian Islands Pacific cod.  *E.g.,* Final Rule at 84435 ("…the Atka shoreplant has not received and processed Aleutian Islands Pacific cod…"); AR4001996-97 ("Atka was not directly engaged in the AI Pacific cod fishery during 2003 through 2013, through local ownership of participating CVs, local ownership of participating CPs, or processing operations at the local shore-based processor in the community.  Atka had essentially no dependency on the AI Pacific cod fishery.").  As such, Adak is the sole community that will benefit from Amendment 113, receiving an exclusive set-aside equal to the lesser of either the Aleutian Islands DFA or 5,000 metric tons.

In the Final Rule, NMFS asserts that Amendment 113 "does not provide a specific allocation of fishing privileges to either [Adak or Atka] shoreplants."  Final Rule at 84444.  But NMFS is ignoring the facts.  NMFS cannot "blind[] itself to the high likelihood that its actions" will cause a particular result.  *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 201 (D.D.C. 2014).  Indeed, NMFS' assertion that the Final Rule does not allocate resources specifically to Adak is belied by the fact that Atka and Adak are the only two civilian communities in the Aleutian Islands west of 170 W. longitude, and the best available information demonstrating that Atka never has, and likely never will, process Pacific cod.  *Com. of Mass. by Div. of Marine Fisheries*

36

*v. Daley*, 10 F. Supp. 2d 74, 77 (D. Mass. 1998), aff'd sub nom. *Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23 (1st Cir. 1999) (holding NMFS violated the National Standards when it "ignored existing data" and "promulgated a regulation that [NMFS] knew, or should have known, would allocate fishing privileges in an inequitable manner."). NMFS cannot hide behind the pretense of neutrality, when the evidence is clearly to the contrary. AR4001996-97.

In reality, NMFS has created a *de facto* exclusive processing privilege for Adak. AR4001904 (acknowledging that there are currently only two shoreplants in the Aleutian Islands west of 170° W longitude, one in Adak and one in Atka). By enacting Amendment 113, NMFS has created a system whereby Adak is at a permanent advantage as compared to other participants in the Aleutian Islands Pacific cod fishery. NMFS violated National Standard 8 by considering the economic impacts of Amendment 113—and allocating resources to a specific fishing community (Adak)—without articulating a legitimate conservation purpose.

     **3.**     **Even if Amendment 113 could be deemed to serve a conservation purpose, NMFS violated National Standard 8 because the purported economic benefits of Amendment 113 are illusory.**

Even if it is assumed that Amendment 113 serves a legitimate conservation purpose, NMFS was thereafter required to select the alternative that minimizes adverse economic impacts and provides the greatest potential for sustained participation of fishing communities. *Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 65 (D.D.C. 2014). Here, NMFS failed to do so, because the purported economic benefits of Amendment 113 are illusory. *See* Section IV.D, *supra*.

The Council's analyses indicated that Amendment 113 is likely to result in net negative or at best neutral economic impacts to Aleutian communities. *See, e.g.,* AR3004638; AR4002020. It is improper for NMFS to assume, without any support, that Atka will derive an economic benefit from Amendment 113 at all, since its shoreplant has never received or processed cod from the directed fishery. *See, e.g.,* AR4001996-97; AR2005814. By reducing

the number of visits by CPs, Amendment 113 reduces economic activity in Adak.  AR4000075; *see also* AR2005814.  NMFS has also recognized "that the [Amendment 113] set-aside 'could potentially lead to a lower price for catch and reduce efficient utilization,' and it is uncertain that this action would benefit the Aleutian Islands communities."  AR2005814.  Amendment 113 is unnecessary at best; the Adak community will not derive any economic benefit beyond what it currently receives when its shoreplant is open and operating.

On balance, Amendment 113 causes economic harm to Plaintiffs and others without providing any economic benefit to Aleutian Island shoreplants or communities.  NMFS therefore ignored the economic reality of Amendment 113 in violation of National Standard 8.  *N. Carolina Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647, 654 (E.D. Va. 1997) (holding NMFS violated National Standard 8 for failing to evaluate the economic impact of summer flounder quota); *N. Carolina Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650, 661 (E.D. Va. 1998) (holding NMFS violated National Standard 8 by performing its economic analysis improperly).[10]

**F.    Amendment 113 violates National Standard 4.**

Pursuant to National Standard 4, if it becomes necessary to allocate or assign fishing privileges among various United States fishermen, "such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and

---

[10] NMFS also asserts that Amendment 113 "is intended to be directly responsive to National Standard 8."  Final Rule at 84436.  This is improper.  The MSA's National Standards do not authorize NMFS to amend an FMP based solely on a particular National Standard.  *Compare* 16 U.S.C. § 1851; 16 U.S.C. § 1853.  Rather, they require that "any [FMP] prepared, and any regulation promulgated to implement any [FMP], … ***shall be consistent with*** the following national standards…."  16 U.S.C. § 1851 (emphasis added).  NMFS is to turn to the National Standards ***after*** it has proposed actions that are "necessary and appropriate for the conservation and management of the fishery."  16 U.S.C. § 1853(a)(1).  The National Standards standing alone do not grant NMFS rulemaking authority, and any attempt by NMFS to do so constitutes legal error.  Nor is NMFS' reliance on MSA section 303(b)(14) any more persuasive.  AR4001900 ("this action is authorized under the MSA under our broad authority 303(b)(14)").  Amendment 113 lacks any rational basis, and is not necessary for the conservation and management of the fishery.

(C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4). Among other things, Amendment 113 reallocates harvest privileges from the Bering Sea in order to preserve it for harvest in the Aleutian Islands, and prohibits Aleutian Islands participants from fishing during the set-aside period unless they deliver to AI shoreplants. Because Amendment 113 is an allocation, NMFS was required to comply with National Standard 4, and failed to do so.

**1.  Amendment 113 allocates fishing privileges to vessels delivering to shoreplants.**

"An 'allocation' or 'assignment' of fishing privileges is a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals." 50 C.F.R. § 600.325(c)(1). Actions may constitute allocations even if not labeled as such by a council or NMFS. *Ace Lobster Co. v. Evans*, 165 F. Supp. 2d 148, 178 (D.R.I. 2001) (limitation on allowed number of lobster traps deemed an allocation); *Texas v. Crabtree*, 948 F. Supp. 2d 676, 687-688 (S.D. Tex. 2013) (shifting fishing days away from certain states and awarding them to other states considered an allocation); *see also Pac. Coast Fed'n Of Fishermen's Ass'n v. Locke*, No. C 10-04790 CRB, 2011 WL 3443533, at *1 (N.D. Cal. Aug. 5, 2011); *Guindon v. Pritzker*, 31 F. Supp. 3d at 201.

Here, NMFS concedes that Amendment 113 is an allocation:

> Amendment 113 and this final rule establish a set-aside that allocates the Aleutian Islands non-CDQ Pacific cod DFA during a portion of the A-season among those harvesting vessels that conduct directed fishing for Aleutian Islands Pacific cod and deliver their catch to Aleutian Islands shoreplants for processing and those harvesting vessels that conduct directed fishing for Aleutian Islands Pacific cod and deliver their catch for processing to any eligible processor other than Aleutian Islands shoreplants. Therefore, this allocation must be fair and equitable to all such fishermen, reasonably calculated to promote conservation, and carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges, consistent with National Standard 4.

Final Rule at 84443; *see also id.* at 84452-53 ("Although the Aleutian Islands Pacific cod set-aside is not identical to other inshore-offshore allocation actions the Council and NMFS have implemented, the set-aside does allocate Aleutian Islands Pacific cod among an inshore sector

(those vessels that deliver their catch to Aleutian Islands shoreplants for processing) and an offshore sector (those vessels that process their catch at sea or that deliver their catch to offshore processors for processing), making it a type of inshore-offshore allocation."); AR4015577 (limited effect on net benefits to the nation because "the action affects distributional equity among various sectors").

Indeed, Amendment 113 results in a zero sum game, whereby catch of Aleutian Islands Pacific cod is shifted from CPs to CVs and from Bering Sea fishermen to Aleutian Islands fishermen. *See id.* at 84436 ("[Amendment 113] [l]imits the amount of early season … Pacific cod that may be harvested by the trawl CV sector."); AR4015503 (Amendment 113 "effectively makes the AI Pacific cod fishery a CV fishery for a specified period of time."); AR 401553 (action "prohibits the trawl CV sector from taking 5,000 mt of their BSAI cod allocation in the BS before March 21."). Thus, Amendment 113 is an allocation within the meaning of National Standard 4.

## 2. Amendment 113 is not fair and equitable to long time offshore participants in the cod fishery.

Amendment 113 is unfair and inequitable to long time offshore participants in the AI Pacific cod fishery, including Plaintiffs. Motherships cannot process at all when  the exclusive set-aside period is fully in effect. Longline and trawl CPs are no longer able to prosecute a fishery that they have operated in for decades. Loomis Decl. ¶¶ 4, 7, 9(a)-(c). Despite assertions by Federal Defendants to the contrary, these participants cannot make up their lost catch either by moving to the Bering Sea or by fishing in the Aleutian Islands after March 15. *Id.* CVs are no longer able to deliver to the processor of their choice, and some long-time participants will be unable to participate at all because they cannot deliver to shoreplants or negotiate a price for their catch that supports continued participation. Final Rule at 84448 ("NMFS acknowledges that this action may result in losses to some participants in the Aleutian Islands Pacific cod fishery"); Paine Decl. ¶ 9, 10(a).

56080387

At the same time, NMFS has failed to articulate a rational basis for concluding that the harms to these fishermen will be offset by any net benefits to either Atka or Adak.  *See* Section IV.D, *supra*.  Moreover, the Council's contention that action was necessary because of shoreplants' inability to move to participate in other fisheries is irrational.  *See*  AR3004158; AR4001902  ("[S]horeside processors cannot move their operations in response to changing conditions or a low AI TAC.").  Instead, the rational conclusion based on the sporadic operating history of the Adak plant would have been that the locations of these two shoreplants are permanent handicaps to sustainable enterprise that cannot be overcome by regulatory action.

### 3.      Amendment 113 does not promote conservation.

As discussed above in Section IV.E.1, Amendment 113 is not reasonably calculated to promote conservation, does not have a conservation purpose, and may adversely affect BSAI fishery resources.  Moreover, NMFS recognizes that Amendment 113 does not reduce TACs and other harvest limits for the fishery.  Final Rule at 84444.  As other courts have recognized, this means that the amendment does "not enhance the conservation [of Pacific cod] in any way." *Texas v. Crabtree*, 948 F. Supp. 2d 676, 687-688 (S.D. Tex. 2013) (final rule that did not impact the total catch allowed did not conserve the species in question).  Thus, Amendment 113 does not promote conservation in violation of National Standard 4.

### 4.      Amendment 113 creates noncompetitive conditions in the AI cod fishery that would otherwise not exist.

National Standard 4 prohibits NMFS from allocating an excessive share of fishing privileges to any particular individual, corporation, or other entity.  16 U.S.C. § 1851(a)(4).  NMFS' guidelines interpreting National Standard 4 explain that an allocation scheme must also be designed "to avoid creating conditions fostering inordinate control, by buyers or sellers, that would not otherwise exist."  50 C.F.R. § 600.325(c)(3)(iii).  Yet NMFS concedes that Amendment 113 creates anti-competitive effects that did not exist in the fishery and ignores the potential for a single operating shoreplant to exert its monopsony power to reduce prices for CVs.  Final Rule at 84447 ("CVs may have less ability to use processor competition for Aleutian

Islands Pacific cod landings to leverage higher prices."); Paine Decl. ¶ 10(a); AR3000534-36; AR3004844; AR 3000528-29 ("Fewer processing options will undermine the harvester's negotiating leverage---resulting in lower prices, and fewer services.").  With Amendment 113, Federal Defendants have eliminated the prior price competition among processors in violation of National Standard 4.

NMFS' contention that Amendment 113 complies with National Standard 4 does not have a rational basis.  Amendment 113 "has no positive impact whatsoever on the utilization of fishery resources <u>except</u> to take economic opportunities away from the historic AI participants and allocate them to one relatively new business enterprise."  AR3000529 (emphasis in original).

In sum, the record shows that Amendment 113 is unfair and inequitable, and was not intended to promote conservation.  Rather, it was intended to provide Adak with an excessive processing privilege by reallocating cod from the Bering Sea and CVs delivering to offshore processors, most of whom are homeported in Seattle, in order "to mitigate the effects of previous Council actions."  Final Rule at 84443; *see also id.* ("This action also addresses an inequity that has occurred, in part, from the establishment of rationalization programs and minimizes the risk of future inequities in the prosecution of the Aleutian Islands Pacific cod fishery.").  But NMFS may not "out of its own sense of equity (and one that is certainly not universally held) [ ] discriminate against" different groups of fishermen."  *Texas v. Crabtree*, 948 F. Supp. 2d at 688. Here, NMFS did so, in violation of National Standard 4.

## G.    **Amendment 113 violates National Standard 5.**

Pursuant to National Standard 5, FMPs and amendments to FMPs "shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."  16 USC § 1851(a)(5).  "An FMP should demonstrate that management measures aimed at efficiency do not simply redistribute gains and burdens without an increase in efficiency."  50 C.F.R. § 600.330(b)(2)(i).  Here, Amendment 113 violates National Standard 5 not only because it creates inefficiencies in the cod

fishery, but also because, as discussed above, the record demonstrates that economic redistribution was its sole purpose.

NMFS concedes that Amendment 113 does not increase efficiency. Final Rule at 84447; AR4000163; AR4000190. NMFS justifies the inefficiencies created by Amendment 113 by citing to "societal" benefits that will allegedly result from the action. NMFS' reliance is misplaced. First, other than economic benefits, NMFS does not provide a discussion of any benefit that is expected to occur in the communities of Adak and Atka. The record is notably void of any discussion of benefits that are typically considered "societal," such as improved public health or safety. Rather, any societal benefit to the public is derived solely from the illusory economic benefit that will result from Amendment 113. *E.g.,* AR4000190; *see also* AR3004573 ("Corporations are not communities, and it's unfair to other stakeholders to begin to equate the two in order to justify a fisheries management structure that is completely focused on helping one plant succeed economically."). Second, even the "social and economic" goals are unsupported by the record—Amendment 113 will not result in any net benefit to Adak, AR4000075, and there is no reason to think that Amendment 113 will create sustainable processing operations, and therefore a stable community, in Adak. *See* Section IV.D, *supra.*

Characterizing the impacts of Amendment 113 as "societal" benefits is tantamount to the proverbial wolf in sheep's clothing. The sole purpose of Amendment 113 is to redistribute processing privileges from offshore users to onshore users, in violation of National Standard 5. AR4015577 (limited effect on net benefits to the nation because "the action affects distributional equity among various sectors"); AR6000176 (Council member Fields: "Mr.Chairman ....it's time to resolve this issue for the community of Adak;" Council member Tweit: Amendment 113 "sure looks like" "an actual allocation of a privilege to a shore-based processor" and "ultimately, if it's successful, it will act exactly like that."). NMFS' purported societal benefits from Amendment 113 are not supported by the record, and NMFS' conclusion that the amendment is consistent with National Standard 5 is without a rational basis in violation of the APA.

In sum, the National Standards taken together are replete with directives against using them to justify actions taken to direct the economic benefits of fishery resources to one group, be it an onshore processor, a particular fleet, or a local community.  Whether called an "excessive share" (National Standard 4), "economic allocation" (National Standard 5) or "preferential treatment" (National Standard 8), an action whose fundamental purpose is to create an unfair economic advantage for a particular user is inconsistent with the MSA's requirements and improper.  Federal Defendants' conclusion that these standards have been satisfied is not rational and unsupported by the record.

## V.        REQUESTED RELIEF

By creating an onshore processing privilege in Amendment 113 and the Final Rule, Federal Defendants exceeded their authority under the MSA to regulate at-sea activities.  In addition, Federal Defendants acted arbitrarily and capriciously in violation of the APA and the MSA by failing to (1) articulate a rational basis for their actions and (2) take action consistent with the MSA, including its National Standards.  The APA directs that a court "shall . . . set aside" any agency action found to be "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Both the Supreme Court and this Circuit look to vacatur as the presumptive remedy for an APA violation.  *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("In all cases agency action must be set aside if the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or if the action failed to meet statutory, procedural, or constitutional requirements." (internal quotations and citations omitted)); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (a plaintiff who "prevails on its APA claim . . . is entitled to relief under that statute, which normally will be a vacatur"); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010).

If the Court finds that Federal Defendants acted without statutory authority, Plaintiffs respectfully request the Court to vacate the Final Rule and Amendment 113.  If the Court finds that Federal Defendants acted arbitrary and capriciously and not in accordance with law,

Plaintiffs respectfully request the Court to vacate the Final Rule and Amendment 113, and to remand them to Federal Defendants with a directive to comply with the requirements of the MSA.

## VI.        CONCLUSION

Amendment 113 and the Final Rule are invalid and illegal as a matter of law. Federal Defendants exceeded their statutory authority in this rulemaking in order to direct economic benefits to one failed enterprise in the hopes that it would revive, to the detriment of fishermen who have managed to succeed for decades in the unforgiving conditions of the Aleutian Islands. Even if the action is within in their authority, Federal Defendants failed to articulate a rational basis for their decision consistent with the National Standards for fishery management in violation of the MSA and APA. Plaintiffs respectfully request the Court to grant summary judgment in favor of Plaintiffs.

Dated this 23rd day of June, 2017.

*/s/ Linda R. Larson*
Linda R. Larson, D.D.C. Bar No. MI00059
Nossaman LLP
801 Second Avenue, Suite 800
Seattle, WA 98104
Telephone:  206.489.5632
Facsimile:   206.489.5501
llarson@nossaman.com

Ashley J. Remillard, CA Bar No. 252374
*Pro Hac Vice*
Nossaman LLP
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone: 949.833.7800
Facsimile:  949.833.7878
aremillard@nossaman.com

*Attorneys for Plaintiffs*

56080387

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2017, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.

*/s/ Linda R. Larson*
Linda R. Larson