# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE GROUNDFISH FORUM *et al.*,

          *Plaintiffs*,

    v.

WILBUR L. ROSS *et al.*,

          *Defendants*.

Civil Action No. 16-2495 (TJK)

## <u>MEMORANDUM OPINION</u>

As part of its responsibility over the management of marine resources, the National

Marine Fishery Service ("the Service") adopts and implements fishery management plans

designed to promote the conservation and sustainable use of the Nation's fisheries. After

promulgating these plans, the Service then periodically amends them, often in response to

changes in the industry, the environment, or the applicable regulatory and legal framework. In

2016, the Service adopted just such an amendment—Amendment 113—to the management plan

for Pacific cod in the Bering Sea and Aleutian Islands archipelago. The Service concluded that

previous conservation measures had led to more vessels in the region processing their catch at

sea, and fewer vessels delivering catch to onshore processing plants in two nearby island fishing

communities—Adak and Atka. To mitigate that impact and allow those communities to develop

sustainable cod-processing enterprises, Amendment 113 sets aside a portion of the Pacific cod

fishery off the coast of the Aleutian Islands each year for exclusive harvest by vessels that intend

to deliver their fish to onshore processing plants located within the specific geographic span of

the Aleutian Islands that encompasses Adak and Atka.

Several trade associations and commercial fishing groups operating in the Aleutian

Islands region sued to challenge the amendment, arguing that it exceeded the Service's statutory

authority under the Magnuson-Stevens Act and is otherwise inconsistent with applicable law. Adak and Atka intervened as defendants. The parties each filed cross-motions for summary judgment. Although the Court finds that the Service did not exceed its statutory authority in imposing a harvest set-aside with an onshore delivery requirement, it nonetheless determines that the Service failed to demonstrate that the amendment satisfied the requisite standards for such regulatory measures set forth by the Magnuson-Stevens Act. Accordingly, and for the reasons explained below, Plaintiffs' motion will be granted, and Defendants' and Intervenors' motions will be denied.[1]

## I.    Legal and Factual Background

### A.    The Magnuson-Stevens Act

In 1976, Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA" or "Act"), 16 U.S.C. § 1801 *et seq.*, with the stated aims, among others, "to conserve and manage the fishery resources" of the United States, "to promote domestic commercial and recreational fishing under sound conservation and management principles," and to prepare and implement "fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1801(b). To achieve these goals, Congress established eight Regional Fishery Management Councils, each of which is "granted authority over a specific geographic region and is composed of members who represent the interests of the states included in that region." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1557 (D.C. Cir. 1991) (citing 16 U.S.C. § 1852).

---

[1] In considering these motions, the Court has relied on all relevant parts of the record, including: ECF No. 2 ("Compl."); ECF No. 35 ("Pls.' MSJ"); ECF No. 36 ("Intervs.' MSJ"); ECF No. 38 ("Defs.' MSJ"); ECF No. 40 ("Pls.' Reply"); ECF No. 42 ("Intervs.' Reply"); ECF No. 43 ("Defs.' Reply"); and ECF Nos. 44–46 (Joint Appendix, with citations designated as "AR__").

Congress has tasked these councils with developing Fishery Management Plans (FMPs), and any later amendments to them, "for each fishery under its authority that requires conservation and management." 16 U.S.C. § 1852(h)(1); *see also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 667 (D.C. Cir. 2016).[2] Each FMP must include, among other things, the "conservation and management measures, applicable to foreign fishing and fishing vessels of the United States, which are . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1). The MSA provides an enumerated set of measures that the councils must include in all FMPs, *see id.* § 1853(a), but it further outlines a set of "[d]iscretionary provisions" that may be included if they are necessary and appropriate for the conservation and management of the fishery, *see id.* § 1853(b).

FMPs and subsequent amendments, and any regulations promulgated to implement them, must "be consistent with [ten] national standards for fishery conservation and management" (the "National Standards") that Congress outlined in the MSA. *Id.* § 1851(a); *see also id.* § 1853(a)(1)(C) (requiring that each "conservation and management measure[]" comply with the National Standards, as well as with any applicable regulations, law, or international agreement). In particular, these National Standards mandate that the conservation and management measures in each FMP conform to specified objectives and conditions. *See id.* § 1851(a)(1)–(10). And the

---

[2] The Act defines a "fishery" to mean "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics" and "(B) any fishing for such stocks." 16 U.S.C. § 1802(13). A "stock of fish" is defined as a "species, subspecies, geographical grouping, or other category of fish capable of management as a unit." *Id.* § 1802(42).

Secretary of Commerce, whom Congress granted regulatory authority over fishery conservation and management under the MSA, has established a set of advisory guidelines for developing FMPs and amendments that interpret the National Standards. *See* 50 C.F.R. §§ 600.305–.355. These guidelines, while not carrying the force of law, *see* 16 U.S.C. § 1851(b), are generally afforded considerable deference by courts, *see, e.g.*, *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 116–117 (D.D.C. 2011).

When a council prepares a new FMP or an amendment to an existing FMP, it must submit the proposal to the Service for review to ensure that the FMP or amendment "is consistent with the national standards, the other provisions of [the MSA], and any other applicable law." 16 U.S.C. § 1854(a)(1)(A).[3] Following publication of the proposal in the Federal Register and an opportunity for the public to respond, the Service may either "approve, disapprove, or partially approve [the] plan or amendment," depending on its consistency with applicable law. *Id.* § 1854(a)(3). Only upon approval by the Service and promulgation as a final rule (or failure to approve or disapprove within 30 days) do FMPs or plan amendments—and the conservation and management measures contained in them—become effective. *See id.* §§ 1854(a)–(b), 1855(d); *Oceana*, 831 F. Supp. 2d at 101.

**B.     Factual and Procedural Background**

**1.     The Bering Sea-Aleutian Islands Pacific Cod Fishery**

The North Pacific Fishery Management Council ("the Council") is tasked with managing fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska. 16 U.S.C.

---

[3] Though Congress granted regulatory authority under the MSA to the Secretary of Commerce, in practice the Secretary has delegated that authority, including the authority to review proposed FMPs and to promulgate implementing regulations, to the Service, a division of the National Oceanic and Atmospheric Administration (NOAA). *See NRDC v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014).

§ 1852(a)(1)(G).  Under that authority, the Council has developed an FMP for several species of groundfish in the Bering Sea (BS) and in the waters of the Aleutian Islands (AI) (collectively "BSAI" or the "BSAI region"), *see* 50 C.F.R. § 679.1(b), including the Pacific cod, AR 1000789.

Pacific cod is one of the most abundant and valuable groundfish species harvested in the BSAI region.  AR 1000790.  Commercial fishing for BSAI Pacific cod is conducted primarily by either catcher vessels ("CVs"), which harvest the fish for delivery to a processor, or catcher-processors ("CPs"), which are capable of both harvesting fish and then processing the fish on board.  *Id.*  Historically, CVs have delivered harvested BSAI cod for processing to both off-shore processors, known as "motherships," and to various onshore processing plants.  AR 4002008.

Under the groundfish FMP, the Service regulates fishing for Pacific cod in the region by establishing yearly harvest limitations.  In consultation with the Council, the Service specifies a "total allowable catch" (TAC) based on projected overfishing levels and other economic and social factors.  AR 1000059–60, 1000790; 50 C.F.R. § 679.20(a), (c).  Each year, shares of the BSAI Pacific cod TAC are then allocated to specific "sectors" of the commercial fishery, "defined by a combination of gear type (*e.g.*, trawl, hook-and-line), operation type (*i.e.*, CV or CP), and vessel size."  AR 1000791; *see also* 50 C.F.R. § 679.20(a)(7)(ii)(A).  These shares are also apportioned by seasons, with the first season of the year labeled the "A season."  50 C.F.R. §§ 679.20(a)(7), 679.23(e)(5).  The members of each sector are collectively limited to harvesting only the amount of their TAC allocation for a given season.  *Id.*

At first, the Service managed Pacific cod in the BSAI region as a single stock with one TAC for the whole region.  *See* AR 1000059.  But beginning in 2014, the Service split the fishery into a BS stock and an AI stock with separate TACs.  *Id.*  Despite this split, the Service continues to allocate portions of the TACs at the BSAI level—that is, sectors are given a share of

the combined TACs for the BS stock and the AI stock which they can harvest anywhere in the BSAI region.  *See* AR 4000093; ECF No. 35-2 ("Paine Decl.") ¶ 8.

### 2.  Aleutian Islands Fishing Communities

The Aleutian Islands are dotted with remote fishing communities that have historically participated in the BSAI fishing industry, two of which—the communities of Adak and Atka—are at the center of this matter.

#### a.  Adak

Adak is a small community located on Adak Island in the Aleutians.  The community participates in the BSAI Pacific cod fishery by way of a small, locally-owned CV fleet and, relevant to this action, a large processing plant.  AR 1000090, 1000793; *see also* AR 3004834. The plant can process 454 metric tons ("mt") of Pacific cod per day, AR 1000090–91, a considerable amount by the parties' accounts, *see* Pls.' MSJ at 9–10; Defs.' MSJ at 6; Intervs.' MSJ at 12.  And according to city leadership, the community depends significantly on the revenues generated by the plant and ancillary activities of the fishing industry.  *See* AR 3004834–35.  But since its establishment in 1999, the Adak shoreplant has only been open for processing intermittently, complicated by several changes in ownership.  *Id.*

#### b.  Atka

Atka is a remote island village located about 100 miles east of Adak.  *See* AR 1000095. Like Adak, the community highly depends on revenues from commercial fishing.  *See id.*  Since 1995, the community has operated a fish-processing facility, mainly for halibut and sablefish delivered from commercial fleets.  AR 1000096.  As of 2016, the Atka shoreplant had not processed Pacific cod.  *See* AR 1000281 (Response 14).  But Atka had recently begun a multimillion-dollar expansion and improvement project to convert the plant into a year-round processing facility with the capacity to process multiple species, including Pacific cod.  AR

1000096.  When Plaintiffs commenced this action, the Atka shoreplant did not yet have the necessary equipment to process Pacific cod.  *See* Compl. ¶ 43; ECF No. 31 ("Intervs.' Ans.") ¶ 43.

### 3.    Amendment 113

In 2008, the Council began looking into possible protections for AI fishing communities in response to changes in the BSAI fishery and commercial fishing industry.  *See* AR 1000049–50, 3000614–17.  Specifically, the Council indicated that the "impetus for the action" arose from concerns expressed by representatives of Adak that increased participation in the BSAI Pacific cod fishery "would erode the historical shoreplant processing share of the AI Pacific cod."  AR 1000099.  Following several years of investigation and discussions of various alternatives, the Council settled on an amendment to the BSAI groundfish FMP—Amendment 113 ("A113")—which it submitted to the Service for review in July 2016.  *See* Fisheries of the Exclusive Economic Zone Off Alaska; Bering Sea and Aleutian Islands Management Area; Amendment 113, 81 Fed. Reg. 46,883 (July 19, 2016).  The next month, the Service issued a proposed rule adopting A113, *see* AR 1000789–804; 81 Fed. Reg. 50,444 (proposed August 1, 2016), and after the close of the comment period, the Service issued a final rule implementing the amendment, *see* AR 1000271–95; 81 Fed. Reg. 84,434 (November 23, 2016).

Amendment 113, at its core, serves to reserve a portion of the harvested AI Pacific cod for onshore processors located in two fishing communities in the Aleutian Islands.  As stated in the final rule, A113 "modifies the BSAI Pacific cod fishery to set aside a portion of the Aleutian Islands Pacific cod [TAC] for harvest by vessels directed fishing[4] for Aleutian Islands Pacific

---

[4] "Directed fishing" refers to those vessels actively targeting a stock of fish, as opposed to vessels that harvest that stock only as incidental bycatch.  *See Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 893 (9th Cir. 2010).

cod and delivering their catch to Aleutian Islands shoreplants for processing." AR 1000272; 81 Fed. Reg. at 84,435. And the amendment specifically defines "Aleutian Islands shoreplants" as only those "processing facilit[ies] that [are] physically located on land west of 170° W. longitude within the State of Alaska," encapsulating the two fishing communities of Adak and Atka. AR 1000273; 81 Fed. Reg. at 84,436.

To accomplish its stated goal, the amendment imposes certain measures: (1) each year, the Service calculates the A-season AI Pacific cod "directed fishing allowance" (DFA), which is equal to the portion of the AI Pacific cod TAC for the A season available for vessels that are "directed fishing" for Pacific cod; (2) 5,000 mt of the DFA—or the entirety of the DFA if it totals 5,000 mt or less that year—is then set aside until March 15 for harvest by only those "catcher vessels that deliver their catch of [AI] Pacific cod to [AI] shoreplants for processing"; and (3) until March 21 of each year, the harvest of Pacific cod in the Bering Sea by the "trawl CV sector"[5]—the largest sector participating in the AI Pacific cod fishery, AR 1000792—is limited by the same amount of the AI set-aside for that year, AR 1000273–75; *see also* 50 C.F.R § 679.20(a)(7)(viii) (codification of A113). That final measure seeks to ensure that BSAI CVs do not exhaust their A-season TAC allocations in the BS region where the set-aside requiring delivery to onshore processors is not in place—since their TAC allocations can be used in either the BS region or the AI region—rather than fish in the AI region and have to deliver harvested cod to AI shoreplants. AR 1000796–97; 81 Fed. Reg. at 50,451–52.

The amendment, however, also includes several failsafe provisions to ensure that the harvest set-aside does not lead to wasted cod harvest. First, for the AI set-aside and BS trawl

---

[5] "Trawling" is a method of fishing in which vessels drag nets along the sea floor to harvest fish, as opposed to "fix gear" techniques such as longline fishing or fishing using stationary traps. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1088–89 (9th Cir. 2012).

CV-sector limitation to take effect, either Adak or Atka must notify the Service of its intent to process AI Pacific cod the upcoming fishing year, the first year no later than December 8, 2016, and no later than October 31 for each year after. AR 1000275.[6] Second, if less than 1,000 mt of the AI set-aside is delivered to AI shoreplants by February 28, the AI set-aside and BS trawl CV-sector limitation will lift for the rest of the A season. AR 1000275.

Explaining in more detail its rationale for implementing A113, the Service pointed to several changes in the regulatory framework that it determined would threaten AI fishing communities' continued participation in the Pacific cod fishery. In particular, the Service noted that the BSAI Pacific cod TAC split and other regional conservation measures had reduced the amount of Pacific cod available for commercial harvest for all participants, including fishing communities like Adak and Atka that had historically processed Pacific cod or had intentions to develop facilities to process Pacific cod in the future. AR 1000794–95. And it further concluded that prior amendments to the FMP had led to an influx of vessels into the AI region with on-board processing capacity, which the Service concluded only exacerbated any threat to those AI communities' participation in the industry. *Id.* In explaining its rationale, the Service clarified that A113 was "intended to be directly responsive to National Standard 8 of the [MSA]," AR 1000795, which states that "[c]onservation and management measures shall, consistent with the conservation requirements of [the MSA] . . . , take into account the importance of fishery resources to fishing communities . . . to (A) provide for the sustained participation of such

---

[6] Neither Adak nor Atka notified the Service of its intent to process Pacific cod prior to December 8, 2016. *See* 82 Fed. Reg. 11,826, 11,827–28 (Feb. 27, 2017). However, for the past two years, Adak has timely notified the Service of its intent to process Pacific cod for the upcoming A season, and thus the harvest set-aside was in effect in 2018 and 2019. *See* 82 Fed. Reg. 57,906, 57,914 (Dec. 8, 2017) (publication of notice of intent for 2018); 83 Fed. Reg. 67,144, 67,145 (Dec. 28, 2018) (publication of notice of intent for 2019).

communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities," 16 U.S.C. § 1851(a)(8).

### 4.     This Action

On December 21, 2016, several trade associations and commercial fishing operations commenced this action, filing a complaint challenging the rule adopting A113 under the MSA and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* Plaintiffs include The Groundfish Forum and United Catcher Boats, two non-profit 501(c) trade associations representing participants in the BSAI Pacific cod fishery, and B & N Fisheries Co. and Katie Ann LLC, two corporations that own CVs and CPs operating in the BSAI region and fishing for Pacific cod. Compl. ¶¶ 11–14. The complaint names as defendants Wilbur Ross in his official capacity as the Secretary of Commerce,[7] NOAA, and the Service. *Id.* ¶¶ 1, 18–20.

The Complaint raises five separate claims for relief under the MSA and the APA. First, Plaintiffs contend that the MSA does not grant the Service the authority to "allocate shore-based processing privileges," and therefore the Service acted beyond its statutory authority when it adopted A113. *Id.* ¶¶ 66–78. As for their second, third, and fourth claims, Plaintiffs allege that A113 is inconsistent with National Standards 4, 5, and 8, respectively, and therefore that the Service's decision to approve the amendment violated the MSA and APA. *Id.* ¶¶ 79–105. Finally, Plaintiffs claim that the Service failed to articulate a rational basis in promulgating A113 such that the decision to adopt and implement the amendment was arbitrary and capricious under the APA. *Id.* ¶¶ 106–10. For relief, Plaintiffs seek vacatur of A113 and remand to the Service for further reconsideration. *Id.* at 28.

---

[7] Wilbur Ross was confirmed as Secretary of Commerce on February 27, 2017, and will be automatically substituted for former Secretary of Commerce Penny Pritzker. *See* Fed. R. Civ. P. 25(d).

In March 2017, the City of Adak and the City of Atka, along with their respective community development associations, (collectively, "Intervenors") moved to intervene as defendants to the action. *See* ECF No. 25. Neither Plaintiffs nor Defendants opposed intervention, and the Court granted Intervenors' motion on March 31, 2017. *See* ECF No. 30.

All parties cross-moved for summary judgment. *See* Pls.' MSJ; Defs.' MSJ; Intervs.' MSJ. On March 14, 2019, the Court held a hearing on the parties' motions.

## II. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When a plaintiff brings claims under the APA, however, the Court "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law, and the complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)). That is so because under the APA "it is the role of the *agency* to resolve factual issues to arrive at a decision that is supported by the administrative record." *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007) (emphasis added). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Citizens for Responsibility & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

Though the APA provides the exclusive vehicle for reviewing regulatory action by the Service under the MSA, the MSA expressly limits the grounds on which such action may be set aside to those described in 5 U.S.C. § 706(2)(A)–(D). *See* 16 U.S.C. § 1855(f); *see also NRDC*, 71 F. Supp. 3d at 55. Under those provisions of § 706(2), a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

Generally, agency action is not arbitrary or capricious provided that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Consistent with that general standard, in reviewing an FMP amendment for consistency with the National Standards, the Court's "task is not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish*, 931 F.2d at 1562. Often "[j]udicial review of agency action under the MSA is especially deferential," because "[f]isheries regulation requires highly technical and scientific determinations that are within the [Service's] expertise, but are beyond the ken of most judges." *N.C. Fisheries*, 518 F. Supp. 2d at 79–80. However, courts "do not hear cases merely to rubber stamp agency actions," and "reminders that [the Service's] scientific determinations are entitled to deference" will not save agency action that otherwise lacks a cogent explanation, particularly when the deficiencies of that explanation have little to do with

the agency's scientific judgment or technical expertise. *NRDC v. Daley*, 209 F.3d 747, 755–56

(D.C. Cir. 2000) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)).

Alternatively, when Plaintiffs claim that the Service's actions exceeded or ran contrary to

its grant of statutory authority in the MSA, the Court will only defer to the Service's

interpretations of the MSA to the extent that deference is warranted under the two-step

framework set out in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). *See Daley*, 209 F.3d

at 752–53. As the D.C. Circuit has explained:

> Under *Chevron* step one, we ask "whether Congress has directly spoken to the
> precise questions at issue." If at that point we determine that "the intent of
> Congress is clear, that is the end of the matter; for the court, as well as the agency,
> must give effect to the unambiguously expressed intent of Congress." We
> proceed to *Chevron*'s second step only "if the statute is silent or ambiguous with
> respect to the specific issue." At the second step, we determine "whether the
> agency's answer is based on a permissible construction of the statute."

*Catawba County v. EPA*, 571 F.3d 20, 32 (D.C. Cir. 2009) (citations omitted) (quoting *Chevron*,

467 U.S. at 842–43).

## III. Analysis

In their complaint, Plaintiffs bring five claims alleging that enactment of A113 violated

both the MSA and the APA, each of which are subject to the outstanding motions for summary

judgment. As stated previously, Plaintiffs' first claim contends that A113 exceeded the Service's

authority under the MSA. They insist that the Service may only regulate conduct that qualifies

as "fishing" under the MSA, but A113, they contend, exceeded that authority by regulating

onshore processing activities. Plaintiffs' second, third, and fourth claims challenge A113's

compliance with the requirements of National Standards 4, 5, and 8, respectively. And

Plaintiffs' final claim asserts that the Service failed to articulate a rational basis for adopting

A113. On Plaintiffs' first claim, which questions the very authority of the Service to impose this

type of harvest restriction, the Court finds that the MSA does not categorically preclude the

Service from implementing the measure at issue here. But because the Court finds that the Service failed to demonstrate that A113 complied with both National Standard 8 and National Standard 4, the Court need not proceed to address Plaintiffs' remaining claims.

### A.    The MSA's Definition of "Fishing"

Plaintiffs' first claim contends that A113 exceeded the Service's regulatory authority under the MSA, such that the amendment's promulgation violated § 706(2)(C) of the APA, because it constitutes an "onshore processing privilege." Pls.' MSJ at 24. According to Plaintiffs, the Service's regulatory authority is limited by the Act's definition of "fishing," which includes only harvesting activities and "any operations *at sea* in support of, or in preparation for," those harvesting activities. *Id.* (emphasis added) (quoting 16 U.S.C. § 1802(15)). Defendants reject this construction of A113. While they concede that "the MSA does not authorize 'shore-based processing privileges,'" Defs.' MSJ at 18, Defendants insist that A113 creates nothing of the sort, *id.* at 12. Rather, they maintain that the amendment "regulates *harvesting*" by setting aside a portion of fish for harvest by those vessels delivering their catch to shore-based processors, and thus that it is consistent with the MSA's definition of "fishing." *Id.* at 14 (emphasis added). And Defendants further assert that to the extent there is any ambiguity about how that definition affects the Service's regulatory authority, the Service's construction of the MSA—specifically, that its definition of "fishing" does not "limit[] [the Service's] discretion to implement a harvest set-aside"—is permissible and therefore warrants deference under *Chevron*. *Id.* at 17.

The question presented by Plaintiffs' argument is whether, in pursuit of the MSA's objectives in implementing FMPs, the Service may enact harvesting measures that impose onshore delivery requirements given the Act's definition of "fishing," which includes only those

support activities occurring "at sea."  The Court, unable to subscribe to the restrictive reading of the MSA advocated by Plaintiffs, finds that it can.

To begin with, the Court fails to see why the definition of "fishing" should be read to impose a strict limit on the Service's regulatory authority.  In their briefing, Plaintiffs neglect to provide any explanation as to how the term "fishing," as *used* in the text of the MSA, works to limit the Service's regulatory authority to enact FMP amendments and conservation and management measures.  Plaintiffs merely recite that definition, note that it describes activities "at sea," and insist that the Service's regulatory authority cannot extend any further without linking that definition to any other provision in the Act.  *See* Pls.' MSJ at 24–25; *see also* Pls.' Reply at 19–23 (arguing that A113 must be unlawful because it creates an onshore processing privilege). That failure alone warrants rejecting Plaintiffs' argument on this issue.  *See Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 382 (D.D.C. 2017) ("The burden is on the plaintiffs challenging the agency interpretation to . . . show 'that the statute *unambiguously* forecloses the agency's interpretation.'" (quoting *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012))). Only at the hearing did Plaintiffs try to clarify where in the MSA the term "fishing" appears so that, in their view, it restricts the Service's regulatory authority.  But even then, Plaintiffs' explanations fell short.

Congress identified broad goals for the MSA, which include conserving and managing the Nation's fishery resources to "realize [their] full potential."  16 U.S.C. § 1801(a)(6).  And in particular, Congress described its purpose as providing for "the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery."  *Id.* § 1801(b)(4).  The MSA defines "optimum"  in part as "the amount of fish which . . . will provide the greatest

overall benefit to the Nation." *Id.* § 1802(33). To that end, the MSA grants the Service the authority to implement FMPs that include the conservation and management measures it finds are "necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(a)(1)(A).

At the hearing, Plaintiffs noted that § 1853(a)(1) further states that an FMP must "contain the conservation and management measures, *applicable to foreign fishing and fishing by vessels of the United States*," that the Service concludes are "necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(a)(1) (emphasis added); *see* Hrg. Rough Tr. at 7–8.[8] But Plaintiffs overlook the fact that A113, as Defendants emphasize, *applies to fishing*. *See* Defs.' MSJ at 14. It restricts which vessels may harvest Pacific cod in the Aleutian Islands during the set-aside period based on where they intend to deliver their harvest for processing. And there is nothing in § 1853(a)(1) or elsewhere in the MSA to suggest that the term "fishing" somehow further limits the measures that the Service may implement, even if it has determined that they are "necessary and appropriate for the conservation and management of the fishery," simply because those measures direct where a vessel may deliver its harvested fish for processing. Indeed, the MSA defines "conservation and management" measures in relevant part as "all of the rules, regulations, conditions, methods, and other measures . . . required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment." 16 U.S.C. § 1802(5); *see also id.* § 1853(b)(14) (providing that FMPs may include "such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and

---

[8] Citations to arguments made at the March 14, 2019 motions hearing are to page numbers in a "rough" transcript provided by the Court Reporter, since the final, certified transcript is not yet available.

management of the fishery"). Given that broad definition, the Court has no basis to recognize a strict yet unspoken limitation on the Service's authority to promulgate such "conservation and management measures" only because the MSA defines "fishing" to include "any operations at sea" in support of harvesting. *Id.* § 1802(16)(D).

During the hearing, Plaintiffs also pointed to the MSA's definition of "fishery," which includes "one or more stocks of fish" as well as any "*fishing* for such stocks." 16 U.S.C. § 1802(13) (emphasis added). By implication, Plaintiffs argued, a "*fishery* management plan" may only regulate the biological stock of fish or the activity of "fishing." Hrg. Rough Tr. at 7–9. But again, Plaintiffs read far too much into the definition of "fishing." Nothing in § 1853 or in the definition of "fishery" suggests that a conservation and management measure, as long as it accords with the requirements of the MSA and is necessary for the conservation and management of the fishery, cannot allocate harvesting privileges based on where a harvester intends to deliver its catch for processing. In other words, the Court cannot conclude that by including the activity of "fishing" in the MSA's definition of "fishery," Congress sought to foreclose the use of a measure that the Service considered necessary for the conservation and management of the fishery simply because it indirectly regulated activity that fell outside the Act's definition of fishing.

Lastly, Plaintiffs appealed to the overall framework of the MSA, arguing that the Act's central purpose—of ensuring the sustainable use of the Nation's fisheries—shows that Congress never intended to grant the Service the authority to regulate onshore processing in the manner undertaken by A113. Hrg. Rough Tr. at 6–7. But if anything, the text of the MSA suggests precisely the opposite. Repeatedly, the MSA directs the Service to consider onshore processors as part of its broader task of managing the Nation's fisheries. *See, e.g.*, 16 U.S.C. § 1853(a)(4)

(requiring that FMPs "assess and specify . . . the capacity and extent to which United States fish processors, on an annual basis, will process [the] portion of [the] optimum yield [of fish] that will be harvested"); *id.* § 1853(a)(9) (requiring that FMPs include "a fishery impact statement" analyzing the impacts of conservation and management measures on "fishing communities," defined to include "United States fish processors that are based in such communit[ies]," *id.* § 1802(17)). In fact, and perhaps most notably, the MSA expressly grants the Service the discretion to impose permitting requirements on onshore fish processors. *See id.* § 1853(b)(1)(C).[9]

Accordingly, the Court cannot conclude, as Plaintiffs urge, that the MSA's definition of "fishing" categorically precludes the Service from adopting A113. The Court observes nothing in the MSA, and Plaintiffs have pointed to no provision, suggesting that Congress, through the definition of "fishing," sought to place a strict limitation on the Service's authority to regulate and manage the Nation's fishery resources as Plaintiffs contend. Moreover, Plaintiffs have identified no relevant ambiguity for the Court to resolve here. And even if Plaintiffs' arguments

---

[9] The parties also hotly dispute the meaning of a September 30, 2009 memorandum written by NOAA General Counsel attorney Lisa Lindeman ("Lindeman Memorandum"), *see* AR 5000068–78, in which she responds to specific questions posed by the Council relating to regulatory proposals it was considering. In that memorandum, Lindeman states that "[t]he [MSA] does not authorize the Council or the Secretary of Commerce . . . to allocate shore-based processing privileges," a conclusion that Lindeman said was "based on the [MSA's] definition of fishing," AR 5000070. Plaintiffs insist that this memorandum makes clear that the Service lacks the regulatory authority to promulgate A113. *See* Pls.' MSJ at 25–27; Pls.' Reply at 24–26. But the memorandum, like Plaintiffs' briefing, still does not explain how the MSA's definition of "fishing," *within the context of the statute's text as a whole*, imposes the limits on the Service's regulatory authority that Plaintiffs claim here. And while Defendants affirmed that the opinions expressed in the memorandum remain the Service's positions, Hrg. Rough Tr. at 31, it is hard to determine from the memorandum itself precisely what those positions are and how they are relevant to this case. Ultimately, the Court can only glean so much from this memorandum and the limited analysis that it provides. And it finds the memorandum of little use in determining whether Congress "directly spoke[] to the precise question[s]" for purposes of applying the *Chevron* framework. 467 U.S. at 842.

were enough to raise an ambiguity in the statutory text, the Court, for the same reasons identified above, would conclude that Defendants' interpretation is a reasonable—indeed, the most reasonable—reading of the statute.

## B.    Compliance with the National Standards

Although the Court finds that the definition of "fishing" does not preclude the Service from enacting A113, that does not end the matter.  The amendment must also comply with the other limitations Congress imposed on the Service's authority, including those expressed in the National Standards.  Plaintiffs point to three of those standards in their challenge to A113— National Standards 4, 5, and 8.  Because the Court finds that the Service failed to adequately demonstrate that A113 satisfies National Standards 8 and 4, the Court will address only those two standards here.[10]

### 1.    National Standard 8

Plaintiffs first contend that A113 is inconsistent with National Standard 8:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirement of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

---

[10] The parties spent little time addressing the appropriate framework for reviewing the Service's conclusions that A113 was consistent with the National Standards, and each appeared to proceed under the assumption that the Court should review those determinations under the familiar "arbitrary and capricious" standard set forth in *State Farm*, 436 U.S. 29.  *See* Pls.' MSJ at 22–23; Defs.' MSJ at 20–21; Intervs.' MSJ at 6.  Defendants in particular never claimed that those conclusions, or the understanding of the National Standards on which they are based, should be reviewed under *Chevron*'s two-step framework.  Indeed, they raised *Chevron* only in response to Plaintiffs' arguments as to the definition of "fishing."  *See* Defs.' Reply at 4–5.  But even if Defendants had invoked *Chevron*, and the Court found it applicable and recognized an ambiguity in the statutory text, that would not save them here.  The Service's explanations of what the National Standards require, as discussed in more detail below, are so divorced from the statutory text that they would necessarily fail under *Chevron*'s second step.

16 U.S.C. § 1851(a)(8). The Secretary, through the advisory guidelines, has interpreted this provision to require that, "[a]ll other things being equal, where two alternatives achieve similar conservation goals, the alternative that provides the greater potential for sustained participation of [fishing] communities and minimizes the adverse economic impacts on such communities [should] be the preferred alternative." 50 C.F.R. § 600.345(b)(1). However, the guidelines further instruct that National Standard 8 "does not constitute a basis for allocating resources to a specific fishing community nor for providing preferential treatment based on residence in a fishing community." *Id.* § 600.345(b)(2). The Service, Plaintiffs contend, accomplished precisely what the guidelines forbid in adopting A113; it allocated resources to specific fishing communities in a measure "intended to be directly responsive to National Standard 8." AR 1000273; 81 Fed. Reg. at 84,436; *see* Pls.' MSJ at 35–37.

Defendants dispute Plaintiffs' characterization of A113, arguing instead that the amendment "is intended to benefit all AI shoreplants." Defs.' MSJ at 25 (edits to capitalization). They contend that because no shoreplant is "entitle[d]" to any amount of fish under the set-aside provision, and thus that the provision does not create an "exclusive" privilege for any one community, A113 does not run afoul of National Standard 8. *Id.* at 26. Intervenors take a similar tack, arguing that A113 does not allocate resources to "a specific fishing community" because "there are *two* . . . shoreplants, on Adak and Atka," that will benefit from the set-aside. Intervs.' MSJ at 31.

But accepting Defendants' and Intervenors' explanations for why A113 is consistent with National Standard 8 would require the Court to ignore the realities of the record, the text of National Standard 8, and the Secretary's clear instructions. A113 expressly singles out and directs harvested Pacific cod to Adak and, to a lesser extent, Atka. The very impetus for the

amendment was a desire to increase those two communities' participation in the Pacific cod fishery. *See* AR 1000272–73; 81 Fed. Reg. at 84,435–36 ("Since 2008, Aleutian Islands fishing communities, and specifically the community of Adak and its shoreplant, have seen a decrease in the amount of Pacific cod being harvested and delivered."). And to accomplish this, the Service adopted a rule requiring that a specific amount of harvested cod, varying depending on the applicable TAC for that year, be delivered to the *only* available onshore processing plant at the time of promulgation. *See* AR 1000272; 81 Fed. Reg. at 84,435 ("Although the Atka shoreplant has not received and processed [AI] Pacific cod, the shoreplant in Adak has received and processed relatively large amounts of Pacific cod."); Intervs.' Ans. ¶ 43 (confirming that Atka could not, at the start of this litigation, process Pacific cod).

Thus A113, rather than "*tak*[*ing*] *into account* the importance of fishery resources to fishing communities" in crafting conservation and management measures, 16 U.S.C. § 1851(a)(8) (emphasis added), directly allocates fishery resources *because of* their importance to *specific* fishing communities. The Service has, in effect, converted National Standard 8's mandate that the Service "take into account" impacts on affected fishing communities when pursuing the MSA's conservation objectives into a tool to affirmatively reallocate fishing privileges to benefit specific fishing communities. This is precisely what the Secretary has concluded National Standard 8 does not empower the Service to do. *See* 50 C.F.R. § 600.345(b)(2) ("This standard does not constitute a basis for allocating resources to a specific fishing community."); *see also Recreational Fishing All. v. Evans*, 172 F. Supp. 2d 35, 46 (D.D.C. 2001) ("While economic effects must be *taken into account*, such effects were not meant to trump the real purpose of the [MSA], which is to preserve and protect United States fisheries." (emphasis added)).

Defendants and Intervenors strenuously, albeit unsuccessfully, seek to avoid this common-sense conclusion. They assert, as the Service did below, that A113 complied with National Standard 8 and the advisory guidelines because it is open to any Aleutian Islands shoreplant located west of 170° W. longitude. *See* Defs.' MSJ at 27; Defs.' Reply at 12; AR 1000121. But this claim is easily dismissed. There are only two fishing communities—Adak and Atka—that fit that remarkably specific criteria. *See* AR 1000090 ("[A]t this time only two cities meet that requirement."). And the Service did not hide the fact that the amendment was designed specifically to benefit those two communities. *See* AR 1000793–94; 81 Fed. Reg. at 50,448–49. Indeed, *only* those two communities were given the ability to even trigger the set-aside. *See* AR 1000275; 81 Fed. Reg. at 84,438.

Nor does it make any difference, in the Court's view, that the Service singled out two fishing communities for beneficial treatment as opposed to one. As mentioned above, when the Service adopted A113, it was clear that vessels would be able to deliver their catch to only one facility—the plant in Adak. And thus A113 immediately gave Adak the power, simply by notifying the Service, to ensure that a portion of harvested cod would be delivered to its plant. The Court is hard-pressed to see how, on that basis alone, A113 does not constitute an allocation of resources to a specific fishing community. But even if Atka does develop the ability to process Pacific cod, the Court fails to see how that cures the defect. A113 still directs a set portion of harvested cod to two *specific* fishing communities. This is not a case in which the Service was presented with two alternative conservation and management measures that might lead to varying effects on fishing communities. *See Daley*, 209 F.3d at 753 ("It is only when two different plans achieve similar conservation measures that the Service takes into consideration adverse economic *consequences*." (emphasis added)). Rather, the Service affirmatively *chose* to

redirect fish to two communities it identified as in need of economic assistance. The Court takes no position on the merits of that choice as a policy matter, but the Court cannot endorse the Service's conclusion that A113 is an exercise of authority consistent with National Standard 8 and the Secretary's explanation of what that standard permits.

For similar reasons, the explanation that A113 is consistent with National Standard 8 because it does not create "exclusive" privileges for Adak and Atka cannot withstand scrutiny. *See* Defs.' MSJ at 25–26; Intervs.' MSJ at 30; *see also* 81 Fed. Reg. at 84,446 (explaining in response to a comment about National Standard 8 that under A113 "no exclusive opportunity to receive any portion of the set-aside is provided to any Aleutian Islands shoreplant"). In the first place, it is not clear to the Court why "exclusivity" should be the touchstone of whether a measure complied with National Standard 8 and the Secretary's guidelines. That language does not appear in the text. Indeed, elsewhere in the guidelines, the Secretary defines an allocation as a "direct and deliberate distribution," which does not seem to require that each recipient be guaranteed a sum certain. *See* 50 C.F.R. § 600.325(c)(1) (defining "'allocation' or 'assignment' of fishing privileges" under National Standard 4). Moreover, as explained above, when the Service adopted this amendment, only Adak would receive the Pacific cod harvested under the set-aside; that is an "exclusive" allocation of resources by any understanding of the term. And if and when Atka also develops the ability to process Pacific cod, A113 will still, by design, direct harvested Pacific cod to the two plants specifically identified by the Service. That neither plant is guaranteed a specific portion of that harvest, or even the unlikely possibility that one of the two plants receives the *entirety* of that harvest, does not change the fact that A113 uses National Standard 8 as a justification to allocate resources directly to two particular fishing communities, despite the Secretary's explicit guidance otherwise.

For these reasons, the Court finds that the Service's decision to approve A113 was arbitrary, capricious, and not in accordance with applicable law. The Court so finds even in light of the deference due to the Service on this issue. The Service's failures arose not in the minutiae of its scientific and technical analyses, but in its inadequate explanation of how A113's obvious, practical effect—in fact, its *intended* effect—of allocating resources to Adak and Atka is consistent with the plain language of National Standard 8. The Court finds that its decision was therefore not "rational [nor] supported by the record." *C & W Fish*, 931 F.2d at 1562.

## 2. National Standard 4

Plaintiffs further contend that A113 is inconsistent with National Standard 4:

> Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). According to Plaintiffs, the amendment, which Defendants agree constitutes an allocation of fishing privileges, falls short on each of those three requirements. *See* Pls.' MSJ at 38–42; Defs.' MSJ at 29. The Court will focus on the second—whether A113 was "reasonably calculated to promote conservation."

Plaintiffs argue that A113 lacks any conservation purpose and thus cannot be said to be "reasonably calculated to promote conservation." Pls.' MSJ at 41. In support, they point to the MSA's definition of "conservation and management," which "refers to all the rules, regulations, conditions, methods, and other measures" that are, among other things, "required to rebuild, restore, or maintain . . . any fishery resource and the marine environment." 16 U.S.C. § 1802(5); Pls.' MSJ at 33. And they note that the Service, in enacting A113, admitted that the amendment provided no benefit to the Pacific cod stock, and instead that "the sole basis for [A113] [was] to

'provide[] the opportunity for vessels, Aleutian Islands shoreplants, and the communities where Aleutian Islands shoreplants are located to receive benefits from a portion of the Aleutian Islands Pacific cod fishery.'"  Pls.' MSJ at 33 (third alteration in original) (quoting AR 1000271).

In response, Defendants and Intervenors both argue that A113 need not "set forth its own 'conservation purpose.'"  Defs.' MSJ at 32; *see also* Intervs.' MSJ at 36.  Rather, they insist that the MSA, and National Standard 4 in particular, only require that the amendment "be justified in terms of the objectives of the *FMP*," Defs.' MSJ at 33 (quoting 50 C.F.R. § 600.325(c)(3)(i)(A)). Provided that A113 is conservation-neutral, in that it does "not weaken the BSAI Groundfish FMP's conservation goals," Defendants insist that the FMP as a whole still promotes conservation and therefore that the amendment complied with National Standard 4.  *Id.* at 25, 33.

The Court cannot agree with Defendants' and Intervenors' characterization of what National Standard 4 requires.  That standard states that an allocation of fishing privileges "shall be . . . reasonably calculated to *promote* conservation." 16 U.S.C. § 1851(a)(4) (emphasis added). And Congress attached that requirement specifically to the "allocat[ion] [of] . . . fishing privileges," not to the FMP as a whole.  *Id.*  Accordingly, by the standard's terms, if the Service decides to allocate fishing privileges to a specific group, that allocation must actually "promote" a conservation purpose—that is, advance or further it—rather than just avoid jeopardizing one. *See* Webster's Third New International Dictionary (1961) (defining "to promote," in relevant part, as "to contribute to the growth, enlargement, or prosperity of: further, encourage").  On that basis, Defendants' and Intervenors' reading is simply belied by the statutory text.  An allocation

that only avoids "weaken[ing]" conservation objectives cannot be said to "promote" them, as the MSA requires.[11]

For that reason, Intervenors' attempt to characterize A113 as a "trailing amendment" to prior conservation measures—in this case, the BSAI TAC split and a measure imposing protections for Stellar sea lions—cannot cure the amendment's inconsistency with the standard. *See* Intervs.' MSJ at 27 (quoting AR 500009); *see also id.* at 36. According to Intervenors, because the "community impacts" of those two prior measures could not reasonably be predicted, the Service properly "cho[se] to wait and see what the final outcome of those prior actions would be," and then proceeded to develop A113 in response. *Id.* (quoting AR 500009). But again, regardless of the merits of that decision as a policy matter, A113's harvest set-aside is admittedly an *allocation*, and thus it must be reasonably calculated to "promote" conservation. That it seeks to mitigate the effects on AI communities of a prior conservation measure cannot circumvent Congress's clear requirement.[12]

---

[11] As previously noted, *see supra* note 10, Defendants have not claimed any entitlement to deference under *Chevron* on this issue. That framework appears most applicable, if anywhere, on the matter addressed here. But again, even if Defendants were to claim *Chevron* deference, and even if the Court were to determine that an ambiguity exists in 16 U.S.C. § 1851(a)(4)(B), the Court finds that Defendants' understanding of what this prong of National Standard 4 requires is entirely foreclosed by the clear text of that provision.

[12] Defendants and Intervenors also point to *NRDC*, 71 F. Supp. 3d 35, in support of their claim that A113 need not itself have a conservation purpose as long as it does not undermine the broader conservation goals of the FMP. *See* Defs.' MSJ at 25; Intervs.' MSJ at 28. In that case, the court upheld the Service's decision to rescind an existing conservation measure that it found in practice had not had a beneficial effect on the health of the fishery, and to justify its decision by pointing to the negative economic effects the measure had on industry participants. *See NRDC*, 71 F. Supp. 3d at 53–54. But the plaintiffs in that case challenged the amendment under National Standard 8, which does not specifically address allocations of fishing privileges and does not include the same directive that an allocation "promote" conservation in National Standard 4. *See id.* at 59–60; *see also* 16 U.S.C. § 1851(a)(8) (requiring only that conservation and management measures remain "consistent with the conservation requirements of" the MSA

Given the standard's directive, the Service's conclusion that A113 complied with National Standard 4 cannot withstand review under the APA.  The Service stated many times during the development of the amendment that the harvest set-aside satisfied the second requirement of A113 because it made no changes to the total TACs for Pacific cod in the BS or AI and did not modify any other existing measures protecting fishery resources.  *See, e.g.*, AR 1000099, 1000143, 1000158.  And the Service affirmed this in promulgating the final rule enacting A113.  *See* AR 1000281 (noting that "the set-aside is reasonably calculated to promote conservation" because it "do[es] not modify" existing total catch limitations or allocations and because the Service "will continue to manage the fishery so that harvests stay within the specified and allocated amounts").  And that conclusion, as explained, is simply not rational in light of the text of National Standard 4.

Despite their claims—and the Service's below—that A113 complied with National Standard 4 because it was conservation-neutral, Defendants and Intervenors also take the seemingly inconsistent position that A113 *does in fact* promote conservation.  They argue it does so because A113 was designed to provide social benefits to the Atka and Adak communities— which they insist is a legitimate "conservation" purpose under the MSA, citing to the Secretary's advisory guidelines for National Standard 4.  *See* 50 C.F.R. § 600.325(c)(3)(ii) (stating that an allocation may "promote conservation (in the sense of wise use) by optimizing the yield in terms of size, value, market mix, price, or economic or social benefit of the product").

The Service, however, did not make that claim in adopting A113.  Rather, the Council in its Regulatory Impact Review stated that A113 was "reasonably calculated to promote

---

when taking into account effects on fishing communities).  To be clear, Defendants and Intervenors cited to *NRDC* in arguing that A113 complied with National Standard 8.  But they relied on the same rationale in defending the amendment under National Standard 4.

conservation" as required by National Standard 4 because it "would not change the TACs for Pacific cod in the BS or AI or modify any measures currently in place to protect living marine resources." AR 1000158. The Service specifically reaffirmed that position when adopting A113 in response to a comment arguing that the harvest set-aside did not comply with the conservation requirement of National Standard 4. *See* AR 1000281 ("[The Service] has also determined that the set-aside is reasonably calculated to promote conservation" because it "do[es] not modify the process for specifying [catch limitations] for the Bering Sea and Aleutian Islands Pacific cod fishery [or other existing BSAI allocations]."). In fact, the Service did so despite previously recommending to the Council while it was developing A113 that it should explain how the set-aside would provide "social benefits to the local fishing communities," such that the Council could then "clearly, explicitly, and more thoroughly articulate the conservation objectives of the proposed action" and comply with National Standard 4. AR 3000536–37.

At the hearing, Defendants acknowledged that the Service did not explicitly link its findings on the potential socio-economic benefits to Adak and Atka with A113's compliance with National Standard 4. *See* Hrg. Rough Tr. at 46. But it urged the Court to look to the record as a whole. *Id.* That record, Defendants insisted, shows that the Service reasoned that A113 would provide important social and economic benefits to the communities in Adak and Atka, and that the Service recognized these benefits as consistent with the broader objectives of the BSAI groundfish FMP. *Id.* at 46–48 (citing AR 100092 (discussing processing's impact on employment in Adak); AR 100096–97 (discussing Adak and Atka's tax revenues from the fishing industry); AR 1000119 (discussing potential tax and revenue impacts of A113 on Adak and Atka); AR 1000278–79 (noting that the Service received letters from commenters arguing that A113 was "essential for maintaining viable communities in Adak and Atka")). In response

to a comment about National Standard 8, the Service did state that it found A113 to be

"consistent with the management objectives of the FMP" because of its "potential societal

benefits, such as providing socially and economically viable fisheries for the well-being of

fishing communities." AR 1000283; 81 Fed. Reg. at 84,446. Yet even then, the Service never

mentioned the *conservation* objectives of the FMP.

The Court does not question those analyses, nor does it doubt Defendants' insistence that

these goals were the driving purpose in implementing this harvest set-aside. Indeed, as

discussed, the Service framed A113 as "directly responsive to National Standard 8." AR

1000795. Even so, the Court, in reviewing the Service's conclusion that A113 complied with

National Standard 4, is limited to the rationale put forth by the Service. *State Farm*, 463 U.S. at

50 ("[C]ourts may not accept . . . counsel's *post hoc* rationalizations for agency action. It is well-

established that an agency's action must be upheld, if at all, on the basis articulated by the

agency itself." (citations omitted)). To be sure, courts will generally "uphold a decision of less

than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 43 (quoting *Bowman*

*Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). And the Court is wary of

endorsing a "magic words" requirement here. But the Court, for several reasons, will not equate

the Service's general conclusions that A113 will benefit the communities of Adak and Atka with

fulfillment of the Service's statutory duty to explain how the amendment comports with National

Standard 4.

At the outset, as noted, the Service in approving A113 took the position that the

amendment complied with National Standard 4 because it made no changes to the existing

regulatory scheme for total catch limits and harvest allocations, not because it benefitted Adak

and Atka. *See* AR 1000281; 81 Fed. Reg. at 84,444 (noting that A113 "do[es] not modify" the

existing framework and "continue[s] to promote and do[es] not undermine the conservation measures established under" other regulatory schemes). The Court questions why the Service would need to characterize this amendment as "promot[ing] conservation" because it did not undermine existing conservation measures if its central purpose—assisting Adak and Atka— was, all along, a legitimate "conservation" goal in its own right under National Standard 4.

Furthermore, the Court struggles to see what purpose National Standard 8 would serve if, as Defendants contend, the "importance of fishery resources to fishing communities [based on] economic and social data" that the Service must "take into account" under National Standard 8— considerations that admittedly drove the Service's decision to adopt A113—constitutes a "conservation" objective of the type contemplated in National 4. 16 U.S.C § 1851(a)(8). If anything, Congress's inclusion of National Standard 8 appears to suggest that the socio-economic benefits to the communities of Adak and Atka identified by the Service are *distinct* from the "conservation" objectives contemplated in National Standard 4. In fact, this distinction is reflected in the Secretary's own advisory guidelines. For example, under National Standard 8, he instructs that "[d]eliberations regarding the importance of fishery resources to affected fishing communities . . . *must not compromise* the achievement of *conservation* requirements and goals." 50 C.F.R. § 600.345(b)(1) (emphasis added). And for National Standard 4, he refers to "[*o*]*ther* factors"—that is, apart from "conservation"—that include "economic and social consequences of the scheme, food production, consumer interest, [and] dependence on the fishery by present participants and coastal communities." *Id.* § 600.325(c)(3)(iv).

The Court cannot be altogether sure what National Standard 4's guidelines mean when they state that an allocation can promote conservation "in the sense of wise use" by "optimizing the yield in terms of size, value, market mix, price, or economic or social benefit of the product."

*Id.* § 600.325(c)(3)(ii).  But it need not wrestle with that question here, because the Service, in explaining why A113 complied with National Standard 4, did not rely on that guidance.  And for the reasons explained, the Court cannot accept Defendants' argument that the socio-economic benefits identified for purposes of National Standard 8 are a sufficient substitute for the Service's obligation to provide a rational explanation of how A113 is consistent with the requirements of National Standard 4.

At bottom, the Court finds that the Service failed to show that A113 complied with National Standard 4—and specifically, the requirement that an allocation of fishing privileges be "reasonably calculated to promote conservation."  16 U.S.C. § 1851(a)(4)(B).  The Service's conclusion that A113 is consistent with National Standard 4 because it made no changes to the various existing measures protecting fishery resources is simply not rational in light of the text of that standard and the facts in the record.  *See C & W Fish*, 931 F.2d at 1562.  For that reason as well, the Service's decision to adopt A113 was arbitrary, capricious, and not in accordance with applicable law.

## IV.     Conclusion

For the above reasons, Plaintiffs' Motion for Summary Judgment, ECF No. 35, will be granted, and Defendants' and Intervenors' Cross-Motions for Summary Judgment, ECF Nos. 36, 38, will be denied.  The Court will vacate the rule implementing A113 and remand A113 to the Service for reconsideration consistent with this opinion.  A separate Order will issue.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 21, 2019